J-A13031-20
J-A13032-20

2020 PA Super 184

E.K.,                                          :    IN THE SUPERIOR COURT OF
                                               :         PENNSYLVANIA
                    Appellee                   :
                                               :
        v.                                     :
                                               :
J.R.A.,                                        :
                                               :
                    Appellant                  :    No. 3233 EDA 2019

Appeal from the Order Entered November 6, 2019
in the Court of Common Pleas of Bucks County
Domestic Relations at No(s): No. 2018-61024-A-40


E.K.,                                          :    IN THE SUPERIOR COURT OF
                                               :         PENNSYLVANIA
                    Appellee                   :
                                               :
        v.                                     :
                                               :
J.R.A.,                                        :
                                               :
                    Appellant                  :    No. 3445 EDA 2019

Appeal from the Order Entered November 6, 2019
in the Court of Common Pleas of Bucks County
Family Division at No(s): No. 2018-61024-C

BEFORE:  BENDER, P.J.E., LAZARUS, J. and STRASSBURGER, J.*

OPINION BY STRASSBURGER, J.:                        **FILED AUGUST 07, 2020**

        Appellant, J.R.A. (Father), appeals from two interrelated orders. The

first is an order entered pursuant to the Protection from Abuse (PFA) Act, 23

Pa.C.S. §§ 6101-6122, granting the petition filed by E.K. (Mother) (PFA Final

---

* Retired Senior Judge assigned to the Superior Court.

Order).  The second is an order entered pursuant to the Child Custody Act, 23 Pa.C.S. §§ 5321-5340, which found Father to be in contempt of a prior custody order (Custody Contempt Order).  We affirm the PFA Final Order, but vacate the Custody Contempt Order.[1]

Mother and Father are parents to J.A., born in 2003 (Daughter), and E.A., born in 2006 (Son) (collectively, Children).  Mother and Father never married, but lived together for over 17 years.  They separated in 2017.  Mother now resides with J.G. (Boyfriend) and Father resides with D.M. (Girlfriend).

The parties have a history of custody and PFA litigation.  By way of background, the first filings occurred in June 2018, when Mother filed an emergency complaint for custody and a PFA petition.  In the PFA petition, she averred that Father had recently inundated her with over 560 text messages in one week, including links to songs with violent lyrics.  She described an alleged history of past abuse, including violence during her pregnancies, an incident in 2011 where Father placed his hands on her throat and slammed her head to the ground, an incident in 2014 where Father injured Mother's wrist by backing up a truck while her hand was stuck in the steering wheel and she was standing on the sideboard during an argument, and an incident

---

[1] Father filed separate notices of appeal in the PFA matter (3233 EDA 2019; PFA Appeal) and the custody matter (3445 EDA 2019; Custody Appeal).  The PFA Appeal and Custody Appeal were listed consecutively before this panel. The trial court filed a combined Pa.R.A.P. 1925(a) opinion for both cases.  For ease of disposition, we discuss and resolve both appeals herein.

in 2017 where Father shoved her head against the wall. In the custody petition, she sought primary physical and legal custody, and made similar averments to those she made in the PFA petition. Following the grant of a temporary PFA order, Mother and Father resolved the pending PFA petition by agreement and negotiated a final PFA order that expired in January 2019. *See* PFA Order, 6/27/2018. In the negotiated order, the parties agreed to share custody of Children on a 50/50 basis. The parties also resolved the pending custody petition by agreement in August 2018, wherein the parties agreed to continue sharing physical custody on a 50/50 basis. *See* Custody Order, 8/9/2018.

In September 2018, Mother filed an emergency petition to modify the custody arrangement, followed by a motion for contempt of the PFA order. Both involved allegations that Father had posted lyrics to a song on his Facebook page that Mother viewed as a threat due to the violent nature of the lyrics and Father's substitution of the names of Mother and Boyfriend in the lyrics. The motion for contempt in the PFA matter was dismissed in October 2018, but the June 27, 2018 PFA order remained in effect.

In the meantime, while Mother's emergency petition for custody modification was still pending, Mother filed a second emergency petition for custody modification in January 2019. She also filed a PFA petition on behalf of Children. *Inter alia*, both January 2019 filings contained averments of an incident, while Children were in Father's care, during which Father was violent

- 3 -

with Girlfriend, injuring Girlfriend. Specifically, Mother averred that Daughter contacted Mother while Daughter was in Father's custody, and told Mother that Father was hurting Girlfriend. Shortly thereafter, Girlfriend showed up at Mother's house, acting hysterical and fearful, and Mother averred that she observed scratches, red marks, and bruises on Girlfriend's neck, wrists, and back.[2] Father was arrested and charged with strangulation, assault, and harassment.

While the custody matter remained pending, the PFA matter was heard in a series of hearings over several months presided over by the Honorable Leslie Gorbey. After multiple hearings, the trial court dismissed the PFA petition on August 23, 2019, and issued findings to accompany its dismissal. The trial court noted that Father's criminal charges had been reduced to a single summary charge, to which Father pleaded guilty after Girlfriend recanted her allegations against Father. Nevertheless, after hearing the testimony of a police officer involved in the investigation, Mother, Father, Girlfriend, and Daughter, the trial court credited Daughter's testimony about the incident over Father's and Girlfriend's, and determined that Father physically abused Girlfriend in his bedroom while Children were in another room on the same floor in Father's house. *See* PFA Order, 8/23/2019, at

---

[2] Mother attached photographs as exhibits to her petitions, averring that the photographs were of Girlfriend's injuries as they appeared to Mother when Girlfriend came to her house.

¶¶ 2-16. Both Mother and Daughter testified that Father physically abused Mother in the past, but acknowledged that Father had not abused Daughter or Son. *Id.* at ¶ 15. During the January 2019 incident with Girlfriend, Father did not hit, physically assault, or touch Daughter in an abusive manner. *Id.* at ¶ 14. Although the trial court assessed "Father's violent behavior" as "[in]appropriate," "[un]acceptable," "concerning," and "alarming," and credited Daughter's fear and discomfort around Father, the trial court concluded that Daughter's feelings did not meet the definition of abuse set forth in the PFA Act.[3] *Id.* at ¶ 17. The trial court opined that "[t]his problem is one that should be addressed in a [c]ustody action and not under the [PFA Act]." *Id.*

Subsequently, Mother's two petitions to modify custody were heard on October 22, 2019, by the Honorable Alan Rubenstein. During that hearing, Daughter was the sole witness and testified about her fear of Father and concerns about his care. At the conclusion of the hearing, the custody court entered a "Domestic Court Sheet" on the docket, with a section labeled "Order" stating the following.

Either party may petition for a further hearing.

Temporary order subject to modification: Mother to have primary physical and sole legal custody of [Children].

---

[3] Mother filed a motion for reconsideration, arguing that a child does not have to be the subject of the abuse or wait for actual physical harm to suffer fear and need protection, but the PFA court denied the motion.

> Father shall have no right to custody with [Daughter]. Father's periods of partial custody with [Son] shall occur on Saturday from 12 noon until 4pm. Those periods of custody are to be with the supervision of Kids First of the Assurance Group. Cost of that supervision to be borne by Father. [Girlfriend] is not to be present at the custody visits.

Trial Court Order, 10/22/2019, at 1 (unnecessary capitalization omitted).

On October 25, 2019, Mother filed a PFA petition, which is the subject of the PFA Appeal, on behalf of herself as the sole plaintiff.[4] In the petition, Mother averred that just two days after the custody hearing, Father posted the following message publicly on his Facebook page.

> This is the position you wanted me in, here I am. You have taken from me and destroyed everything I care about. You say you don't hate me, yet you keep yanking them out of my life time and time again. Fuck you bitch, send that to your fucking fat ass indignant lawyer. You and that fat fuck are nothing but backstabbing conniving bitches, and yes Jan I mean your (*sic*) a bitch. One day you and everything fat ass has done to me will be returned to you tenfold, just make sure you know that when that day comes I will be on the ground in tears laughing hysterically.

PFA Petition, 10/25/2019, at 11.1. Mother averred that she viewed this post as a threat to harm her physically, and that in the past, Father had "made good" on similar threats against her. *Id.* She also viewed the post as a threat against her lawyer Jan Grossman, who also is the managing partner at Mother's employer, We Care Legal Services, which is a family law firm. *Id.* She stated that Father has "stalked, attacked, strangled, harassed, and

---

[4] Mother also filed an emergency petition to modify custody in the custody matter with similar allegations, which remained pending on the custody docket at the time the record was transmitted to this Court.

threated to kill" her multiple times in the past. *Id.* The trial court entered a temporary PFA order and scheduled a final hearing for November 6, 2019.

Judge Rubenstein, the same trial judge who recently had heard the parties' custody matter, presided over the November 6, 2019 PFA hearing. Both Mother and Father were represented by counsel, and both parents testified. The trial court summarized their testimony as follows.

> At the [PFA] hearing, Mother testified that while the parties were still inside the Bucks County Justice Center on October 22, 2019, Father sent a text to Son. Mother observed the text message from Father in which Father told Son that it was Daughter's "fault" that Father could no longer see Son.

> Mother testified that she became aware of Father's Facebook post after the custody hearing and she felt threatened by the post[, specifically the threat to seek retribution "tenfold."].

> ***

> Mother felt that in his Facebook post, Father was insinuating that he was going to get "revenge" on her, or "more than likely, try to kill [her]."

> When she testified, Mother stated that she first experienced Father's violent behavior when she was pregnant with Daughter 17 years ago. She stated: "The first time that it was more than a shove was when I was pregnant with Daughter[,] when he dragged me down the street in a chokehold." Mother stated that she remained in this relationship because of fear and financial difficulties.

> Mother related that after Daughter testified at the custody hearing of October 22, 2019, Father sent "over 40 text messages" to Daughter, despite [the Custody Court's October 22, 2019 custody order] stating Father was to have no contact with Daughter. Mother stated that as a result of the many text messages from Father, Daughter was tearful and anxious, and Daughter thereafter reached out to her therapist for assistance.

… Mother testified about the prior multiple acts of abuse which she suffered at the hands of Father. She testified that in the past Father had hit her with his pick-up truck which caused a fractured wrist. Mother stated that in prior instances, Father had grabbed her by the throat and choked her. On one occasion Father lifted Mother from the floor while choking her. Mother again testified that Father dragged her down the street in a headlock while she was pregnant with Daughter. Mother also asserted that she was the victim of unspecified sexual violence perpetrated by Father.

On cross-examination, Mother recalled an incident where Father was choking her with her "feet off the ground" and Father's father walked into the room and witnessed Father choking her. Mother testified that she believed Father's father would intervene and help her. Instead he "screamed" at her and told her it was her "fault" that Father "acted this way."

Mother was asked on cross-examination why she did not contact the police if she suffered abuse for 17 years. She stated that she never contacted the police because she was "terrified." Mother testified that she had also been previously threatened by members of Father's family.

During her testimony, Mother stated that Father had also stalked her at various times. Mother testified that Father stalked her from September 2017 through June 2018, when Mother filed her [first PFA petition].

Mother stated that in April 2019 she found a tracking device on her vehicle which she took to the local police station. Mother asserted that she was confident that Father purchased the tracker because she received Father's credit card statement during a support hearing and the tracking device was a purchase noted on his credit card statement.

Mother testified that she had seen Father stop in front of her residence in his car. She stated that Father would stay for "a few minutes" and then drive away. Mother stated that her address was confidential, and she did not know how Father knew where she lived.

Mother further testified that she had noticed "strange things" around her property. She stated that on one occasion the lug nuts on one of her car tires had been loosened. She also stated that her security cameras would depict a vehicle, similar to Father's, in the parking lot near her home. Mother testified that the vehicle was a similar make and model to Father's car, a "late 90's Nissan Maxima with stickers on the back."

Mother testified that her current situation with Father has been "stressful," and she has been living on "high alert." Mother asserted that Father only ceases this behavior when a [PFA order] is in effect.

Father also testified during the [PFA] hearing on November 6, 2019. His testimony began with Father confirming that he was the one who posted the [message on his] Facebook page. Father stated that he posted on Facebook because he was upset, and that he only intended to convey that "karma" would come back to Mother. During his testimony, Father denied that he went to Mother's home after they separated, and he denied ever "physically attack[ing] members of her family."

During his testimony, Father did not deny any of the prior abuse incidents of which Mother testified. Mother testified that she suffered serious, long-term abuse[,] which occurred throughout the parties' 17-year relationship; however, Father never denied any of those allegations in his testimony.

Trial Court Opinion, 12/20/2019, at 3-6 (names altered; citations to notes of testimony omitted).

At the conclusion of the PFA hearing, the trial court announced that it was granting Mother's PFA petition. It also *sua sponte* made a ruling in the parties' custody case. As the trial court explains in its Pa.R.A.P. 1925(a) opinion,

[i]n the October 22, 2019 custody order, the trial court had previously ordered that Father was to have no contact with Daughter. During the PFA proceeding, Mother testified, and it was

- 9 -

> unrebutted by Father, that he had sent approximately 40 text[] messages to Daughter in one evening following the entry of the October 22, 2019 custody order. … The trial court used its judicial discretion to incorporate by reference the October 22, 2019 custody order. The trial court held Father in contempt of the October 22, 2019 custody order [and sanctioned him to immediate incarceration for six months, or until he satisfied the purge condition, which was to] write in his own hand how he planned to follow [the custody order] going forward.

Trial Court Opinion, 12/20/2019, at 6 (names and references altered).

Despite sanctioning Father to a period of incarceration, the trial court did not reduce its ruling regarding contempt of the custody order to a written order. Instead, it filed on the custody docket the portion of the transcript from the PFA hearing where it announced its ruling.

The trial court did, however, enter the PFA Final Order in a separate written order on the PFA docket. The PFA Final Order expires on November 5, 2022, and *inter alia*, it: (1) prohibits Father from abusing, harassing, stalking, or threatening Mother, or attempting to use physical force that would reasonably be expected to cause bodily injury to Mother, in any place where she might be found; (2) prohibits Father from contacting Mother by telephone or any other means, including through third persons; (3) prohibits Father from going to Children's schools and any law office of We Care Legal Services; (4) prohibits Father from having contact with Children and gives Mother sole legal and primary physical custody to Mother; (5) supersedes the parties' prior custody orders; and (6) prohibits Father from stalking or harassing Boyfriend, Children, and "all employees of We Care Legal Services." ***See generally*** PFA

Final Order, 11/6/2019. On November 12, 2019, Father timely filed a notice of appeal from the PFA Final Order, which was docketed in this Court at number 3233 EDA 2019.[5]

Meanwhile, in the custody case, on the same day Father filed his notice of appeal of the PFA matter, Father filed an emergency motion to vacate the contempt order and to be released from custody, arguing that the trial court's *sua sponte* holding Father in contempt of a custody order at the PFA hearing violated his due process rights. On November 20, 2019, the trial court entered an order specifying that Father should be immediately released from custody at the Bucks County Correctional Facility because he met the purge condition. Order, Custody Docket, 11/20/2019. Following the order in the certified record appears a handwritten note stating, "Per your custody order, I will not have any custody with [Mother] or [Children] in any way or capacity until allowed to do so by this court. Furthermore, I will not make any social media posts, of any kind, relating to any of my court cases, [Mother] or [Children]. Sincerely, [Father] 11-19-19." *Id.* at Exhibit 1 (numbering supplied). On November 21, 2019, the trial court denied Father's emergency motion as moot.

---

[5] The trial court ordered Father to file a concise statement of matters complained of on appeal, and Father complied. Subsequently, this Court designated Father's appeal from the PFA Final Order as a Children's Fast Track case pursuant to our rules of appellate procedure.

On December 5, 2019, Father filed a notice of appeal from the Custody Contempt Order, and attached the transcript reflecting the oral order. The appeal was docketed at this Court at 3445 EDA 2019. Noting the lack of a separate written order on the custody docket, this Court directed the trial court to reduce the oral order from November 6, 2019, to a written order. The trial court eventually complied, entering an order on February 6, 2020.[6, 7]

In his appeal from the PFA Final Order, Father raises the following issues.

1. Whether the trial court erred as a matter of law and abused its discretion in entering a three-year [PFA] order on behalf of Mother.

2. Whether the trial court erred as a matter of law and abused its discretion when it allowed Mother to litigate allegations and matter[s] that were already litigated and ruled on by the same trial court during a prior PFA trial.

3. Whether the trial court erred and abused its discretion when it allowed Mother to testify about alleged abuse from as far back as [15] to [20] years.

4. Whether the trial court erred as a matter of law and abused its discretion in entering a three-year [PFA] order on behalf of Children, as [] protected part[ies].

---

[6] The trial court did not order Father to file a concise statement, and Father did not file one. The trial court filed the same Pa.R.A.P. 1925(a) opinion it had filed in the PFA Appeal.

[7] Mother did not file a brief in the PFA Appeal. In the Custody Appeal, Mother submitted a letter indicating that she could not afford a lawyer and did not plan to submit a brief, but indicated that she was in agreement with the trial court's reasoning in its Pa.R.A.P. 1925(a) opinion.

5. Whether the trial court erred as a matter of law and abused its discretion in entering a three-year [PFA] order on behalf of Boyfriend.

6. Whether the trial court erred as a matter of law and abused its discretion in entering a three-year [PFA] order on behalf of all employees of We Care Legal.

Father's Brief in PFA Appeal at 7-8 (unnecessary capitalization and suggested answers omitted; names altered; issues reordered for ease of disposition).

In Father's Custody Appeal, he raises one issue: "[w]hether the trial court erred as a matter of law and abused its discretion when it violated Appellant's due process rights in holding Appellant in contempt of a temporary custody order and remanding Appellant to the Bucks County Correctional Facility for a period of six months." Father's Brief in Custody Appeal at 5 (unnecessary capitalization omitted).

## PFA Appeal at 3223 EDA 2019

Issue One: Sufficiency of the Evidence

We begin with Father's first issue in the PFA Appeal: whether Mother met her burden in establishing the need for the PFA Final Order. "Our standard of review for PFA orders is well settled. 'In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion.'" **Boykai v. Young**, 83 A.3d 1043, 1045 (Pa. Super. 2014) (quoting **Stamus v. Dutcavich**, 938 A.2d 1098, 1100 (Pa. Super. 2007)).

"The PFA Act does not seek to determine criminal culpability. A petitioner is not required to establish abuse occurred beyond a reasonable

doubt, but only to establish it by a preponderance of the evidence." ***K.B. v.***

***Tinsley***, 208 A.3d 123, 128 (Pa. Super. 2019) (citation and brackets omitted).

A "preponderance of the evidence standard is defined as the greater weight

of the evidence, *i.e.*, [enough] to tip a scale slightly." ***Raker v. Raker***, 847

A.2d 720, 724 (Pa. Super. 2004).

> When a claim is presented on appeal that the evidence was not sufficient to support an order of protection from abuse, we review the evidence in the light most favorable to the petitioner and granting her the benefit of all reasonable inferences, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it.

***K.B.***, 208 A.3d at 128.

In relevant part, the PFA Act defines abuse as the "occurrence of one or

more of the following acts between family or household members, sexual or

intimate partners or persons who share biological parenthood: … (2) Placing

another in reasonable fear of imminent serious bodily injury."  23 Pa.C.S.

§ 6102(a)(2).

"The purpose of the PFA Act is to protect victims of domestic violence

from those who perpetrate such abuse, with the primary goal of advance

prevention of physical and sexual abuse." ***Buchhalter v. Buchhalter***, 959

A.2d 1260, 1262 (Pa. Super. 2008).  "In the context of a PFA case, the court's

objective is to determine whether the victim is in reasonable fear of imminent

serious bodily injury…." ***Raker***, 847 A.2d at 725.  Past acts are significant in

determining the reasonableness of a PFA petitioner's fear. *K.B.*, 208 A.3d at 128.

In the instant case, Father contends the trial court entered a three-year -long PFA order against him "in essence because [Father] made a Facebook post in frustration a couple of days after a temporary custody order was entered in the parties' custody case." Father's Brief in PFA Appeal at 14. Father argues that Mother failed to demonstrate that she had a reasonable fear of imminent serious bodily injury because she testified Father never showed up at her work, and the last time Father appeared at her house was in October 2018, a year prior to the PFA hearing. *Id.* at 16-17.

In its Rule 1925(a) opinion, the trial court rejected Father's assertion that his Facebook post was created out of transitory anger. To the contrary, the trial court found that the words of the post were threatening to Mother, especially when viewed in light of the past abuse to which Father subjected Mother over an extended period of time and stalking incidents as recent as April 2019. Trial Court Opinion, 12/20/2019, at 10-12. The trial court found that Father knew the post was threatening, and he intended it to be seen by Mother.

We discern no abuse of discretion in the trial court's determination that Mother had a reasonable fear of imminent serious bodily harm by Father. Just two days after a hearing concluded on custody petitions filed by Mother wherein Father's custodial rights were cut back, Father created a Facebook

post and made it public so that anyone could see it. He ranted about his perceived notion that Mother took Children from him, told her "[f]uck you bitch," and threatened Mother and her counsel with retribution "tenfold." PFA Petition, 10/25/2018, at 11.1 (numbering supplied). Mother interpreted Father's threat of retribution as a threat to harm her physically, and possibly even kill her. This has caused her to live on "high alert." N.T., 11/6/2019, at 36.

The trial court determined that based upon Mother's testimony about Father's past physical abuse of her, her fear of imminent serious bodily harm was reasonable. The trial court also factored in Mother's description of a history of stalking since her separation from Father. Father attempts to minimize Mother's testimony by focusing on her statement that the last time she definitively knew he appeared at her house was in October 2018. However, this description of Mother's testimony is selective and taken out of context. Mother testified Father stalked her from their separation in September 2017 until the entry of the first PFA order in June 2018. In October 2018, one week prior to a child support hearing, Mother saw Father drive up in his car, stop outside her house for a few minutes, and then drive away. This was particularly concerning to her because her address was supposed to be confidential, but Father had made it clear to Daughter he knew where Mother lived, and Girlfriend had showed up at Mother's house after the January 2019 incident where Father abused Girlfriend. She also found a

tracking device on her car in April 2019, and based upon a purchase of a tracking device appearing on Father's credit card statements provided to her in the parties' child support hearings, believed it was Father who placed it there.

Given the foregoing, the trial court concluded that the Facebook post reasonably seemed less innocuous to Mother when colored by Father's past conduct. Considered as a whole, and when viewed in the light most favorable to Mother, *see K.B.*, 208 A.3d at 128, Mother's testimony about these incidents and communications establish by a preponderance of the evidence that Father's Facebook post placed her in reasonable fear of imminent serious bodily injury. Accordingly, we discern no error of law or abuse of discretion in the trial court's entry of the PFA Final Order in favor of Mother and against Father.

Issue Two: *Res Judicata* and Collateral Estoppel

Father assails the trial court's admission of testimony by Mother regarding past abuse during the PFA hearing. He contends that Mother should not be permitted to testify about abuse that she already litigated and lost; he points to the denial of her motion for contempt in 2018, the August 2019 denial of her PFA petition filed on behalf of Children in January 2019, and the resolving of her first PFA petition in 2018 by agreement without admissions. Father's Brief in PFA Appeal at 24-26. According to Father, the principles of

*res judicata* and collateral estoppel prevent Mother from re-litigating past abuse in the current PFA matter. *Id.*

Father's analysis of *res judicata* and collateral estoppel is perfunctory, simply concluding that because the parties had prior litigation over PFA matters, and some of those matters did not result in Mother's favor, she should be precluded from litigating past abuse. *Id.* However, even a brief examination of the doctrines reveals that neither doctrine is applicable here.

We have said the following regarding *res judicata*.

> [T]he doctrine of *res judicata* applies to prevent litigants from bearing the burden of re-litigating the same issues with the same parties, and to promote judicial economy. For *res judicata* to apply, the following elements must be concurrent across both actions: (1) the identity of the thing sued upon; (2) the identity of the cause of action; (3) the identity of persons and parties to the action; and (4) the identity of the quality or capacity of the parties suing or being sued. The dominant inquiry under those elements, then, is whether the controlling issues have been decided in a prior action, in which the parties had a full opportunity to assert their rights.

*In re N.A.*, 116 A.3d 1144, 1148-49 (Pa. Super. 2015).

Here, the identity of the thing sued upon and the cause of action are not the same. Her current PFA petition seeks to litigate whether she currently has a reasonable fear of imminent bodily harm. Similar to a dependency petition, the "element of time is integral" to a PFA petition, and "each petition in this instance necessarily implicates a different cause of action." *Id.* at 1149 (holding that because each dependency petition under the Juvenile Act

- 18 -

examines whether a child at that time is dependent, technical *res judicata* does not apply).

Collateral estoppel, which sometimes is referred to as issue preclusion, "is a broader concept than *res judicata* and operates to prevent a question of law or issue of fact which has once been litigated and fully determined in a court of competent jurisdiction from being re[-]litigated in a subsequent suit." **Vignola v. Vignola**, 39 A.3d 390, 393 (Pa. Super. 2012). Collateral estoppel applies

> if (1) the issue decided in the prior case is identical to one presented in the later case; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding and (5) the determination in the prior proceeding was essential to the judgment.

*Id.*

Contrary to Father's argument, the issue of whether Father abused Mother in the past has not been litigated and fully determined. In her first PFA petition filed in 2018, Mother alleged that Father had threatened her recently online, and also alleged a significant history of physical abuse. The parties agreed to resolve the matter through negotiating terms of the PFA order rather than proceed to a hearing, so the parties did not have a full and fair opportunity to litigate the issue of past abuse in the prior proceeding.

- 19 -

Although Mother's 2018 motion for contempt in the PFA matter was dismissed, her motion related to a narrow issue focused on a specific Facebook post that Father had posted concerning song lyrics. Thus, the issue at hand in the contempt motion did not resolve the issue of past abuse.

This is also the case with Mother's PFA petition filed in January 2019 that was denied in August 2019. The essential issue in the January 2019 petition was Father's abuse of Girlfriend, not abuse of Mother. Additionally, the parties are not the same; the January 2019 petition was filed solely on Children's behalf, whereas the current PFA petition was filed on Mother's behalf.

Accordingly, Mother was not precluded from testifying about past abuse by Father based upon the doctrine of *res judicata* or collateral estoppel.

Issue Three: Remoteness of Past Abuse

In his third issue, Father contends the incidents of past abuse Mother testified about were too remote to be relevant, emphasizing that some of the events occurred almost twenty years ago. Father's Brief in PFA Appeal at 27-28. He claims the trial court improperly justified admission of the testimony by finding that Father subjected Mother to continuing and pervasive abuse, which in Father's view is unsupported by the record. *Id.* His final point is a proverbial "Hail Mary" argument pleading unfairness; although Father did not even so much as deny Mother's allegations of physical or sexual abuse during the hearing, he claims the trial court abused its discretion in permitting

testimony of abuse dating back almost 20 years, because it presented an "insurmountable burden" for him to overcome when Mother failed to present any corroborating evidence to her testimony. *Id.*

Father has not preserved this issue for appellate review by failing to make a contemporaneous specific objection at the PFA hearing. ***Commonwealth v. Smith***, 213 A.3d 307-311-12 (Pa. Super. 2019) (finding evidentiary issue waived for failure to lodge a timely and specific objection at trial); Pa.R.A.P. 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). During Mother's lengthy testimony about the past history of abuse, Father's counsel only made one objection, and it was "to any previous mentions of PFAs" without further explanation. N.T., 11/6/2019, at 10.

Even if Father has not waived this issue, his claim would not succeed. This Court has stated that "[p]ast abusive conduct on the [defendant's] part [is] a crucial inquiry necessary for entry of a proper order." ***Custer v. Cochran,*** 933 A.2d 1050, 1059 n.11 (Pa. Super. 2007) (*en banc*) (citing ***Raker***, 847 A.2d at 726). Because the goal of the PFA Act is to prevent physical and sexual abuse, a victim does not have to wait for physical or sexual abuse to occur for the PFA Act to apply, and past acts are relevant to determine the reasonableness of the petitioner's current fear. ***K.B.***, ***supra***, at 3; ***Miller ex rel. Walker v. Walker***, 665 A.2d 1252, 1259 (Pa. Super. 1995) (holding that "in light of the protective purposes of the [PFA Act], it was

within the trial court's discretion to hear any relevant evidence that would assist it in its obligation to assess the appellee's entitlement to and need for a [PFA] order," including evidence of abuse occurring six years prior). "Questions concerning the admission or exclusion of evidence are within the sound discretion of the trial court and may be reversed on appeal only when a clear abuse of discretion was present." *Buchhalter*, 959 A.2d at 1263 (citation omitted).

As detailed *supra*, Mother testified about a pattern of significant physical abuse beginning with her pregnancy with Daughter in 2003 and lasting throughout her relationship with Father. Mother testified to a multitude of incidents, including several attempts to choke her, a fractured wrist, and other injuries. She sought medical treatment for her injuries as recently as 2015. N.T., 11/6/2019, at 32. While their separation brought about a cessation to the physical and sexual abuse, Mother testified about ongoing concerns about Father's behavior post-separation, including stalking and tracking her whereabouts. Thus, the trial court's assessment of the situation as an ongoing pattern of abuse has ample support in the record. Moreover, since an incident of domestic violence occurring in the past could leave long-lasting trauma that is triggered by a more recent incident, even an incident that is remote in time could be relevant to the reasonableness of a petitioner's current fear.

Father had ample opportunity to cross-examine Mother, testify on his own behalf, or present witnesses or other evidence to defend against Mother's

testimony. Mother did not need to present corroboration of her testimony to meet her burden under the PFA Act. A PFA petitioner's testimony alone, if believed by the trial court, may constitute sufficient evidence of abuse. *Custer*, 933 A.2d at 1058. Therefore, we conclude that the trial court did not err in permitting Mother to testify about the entire history of intimate partner violence between her and Father.

Issues Four and Five: Inclusion of Boyfriend and Co-Workers in the PFA Final Order

Because they involve similar issues, we will address Father's fourth and fifth issues in the PFA Appeal together. Father contends the trial court erred by entering the PFA Final Order on behalf of Boyfriend and Mother's co-workers at We Care Legal. Regarding Boyfriend, Father argues that since Boyfriend did not testify on his own behalf, and the only testimony Mother offered regarding Boyfriend was Mother's vague accusation that "[t]hreats have been made against him in the past," the trial court erred by including Boyfriend. *Id.* at 20-21 (citing N.T. 11/6/2019, at 13). Finally, Father argues that although Mother testified she feared for her co-workers' safety, because she conceded that Father has never been to her place of work, the co-workers "cannot possibly be 'in reasonable fear of imminent serious bodily injury' as required for a finding of 'abuse' under 23 Pa.C.S.[] § 6102(a)." *Id.* at 23.

Father's arguments are misplaced. The PFA Final Order grants relief to Mother as the plaintiff and sole protected person. *See* PFA Final Order,

11/6/2019, at 1. *Vis-à-vis* Boyfriend and Mother's co-workers, Father is only prohibited from stalking or harassing these individuals.[8] *Id.* at 4. Father ignores the distinction between comprehensive protections provided to a plaintiff and lesser protections provided to "other designated persons." 23 Pa.C.S. § 6108(a)(9). Section 6108 of the PFA Act sets forth the permissible types of relief the trial court may order "to bring about a cessation of abuse of the plaintiff or minor children." *Id.* at § 6108(a). In subsection 6108(a)(9), the PFA Act permits a trial court to direct a defendant "to refrain from stalking or harassing the plaintiff and other designated persons as defined in 18 Pa.C.S. §§ 2709 (relating to harassment) and 2709.1 (relating to stalking)." *Id.* To obtain this relief, nothing in the PFA Act requires the plaintiff to prove that the other designated persons suffered abuse by the defendant. Logically, prohibiting the stalking and harassing of certain persons significant to the plaintiff may help "bring about a cessation of abuse of the plaintiff." *Id.* at § 6108(a). Thus, no relief is due to Father as to Boyfriend and Mother's co-workers.[9]

---

[8] Relatedly, Father is also prohibited from entering Mother's workplace. This prohibition is permissible under the PFA Act. 23 Pa.C.S. § 6108(a)(6) (providing that the trial court may prohibit "the defendant from having any contact with the plaintiff … including, but not limited to, restraining the defendant from entering the place of employment … of the plaintiff…."). Nothing in the PFA Act requires a showing that a defendant has entered a workplace in the past before a defendant can be prohibited from entering a workplace of a plaintiff in a PFA order.

Issue Six: Inclusion of Children in the PFA Final Order

Father argues the trial court erred by entering a PFA Final Order on behalf of Children as protected parties. Father's Brief in PFA Appeal at 7, 19. He claims "[a]bsolutely no testimony was offered to justify issuance of a PFA [order] on behalf of [Children]." *Id.* In his view, the trial court could not have concluded Children were abused or were in danger of abuse within the

_____

[9] We note there is some ambiguity in the PFA Act as to whether "as defined in 18 Pa.C.S. §§ 2709 (relating to harassment) and 2709.1 (relating to stalking)" refers to a definition of "stalking or harassing" or "other designated persons." 23 Pa.C.S. § 6108(a)(9). It appears this is an issue of first impression. Sections 2709 and 2709.1 of the Crimes Code do not define the term other designated persons, and criminalize harassment and stalking of one person by another without restriction as to classifications of people. 18 Pa.C.S. § 2709(a); *id.* at § 2709.1(a). Both sections define the term "[f]amily or household member." 18 Pa.C.S. § 2709(f); *id.* at § 2709.1(f). However, the term family or household member is only used in reference to an increase in grading. 18 Pa.C.S. § 2709(c)(3) (providing that "[t]he grading of an offense under subsection (a)(1), (2) or (3) shall be enhanced one degree if the person has previously violated an order issued under 23 Pa.C.S. § 6108 (relating to relief) involving the same victim, family or household member"); *id.* at § 2709.1(c)(2) (providing that "[a] second or subsequent offense under this section or a first offense under subsection (a) if the person has been previously convicted of a crime of violence involving the same victim, family or household member, including, but not limited to, a violation of … an order issued under 23 Pa.C.S. § 6108 (relating to relief) shall constitute a felony of the third degree"). Therefore, it is not clear whether the General Assembly intended to restrict the protections in the PFA Act set forth in subsection 6108(a)(9) to family or household members, or whether it was up to the trial court to determine the scope of the designated persons.

Father sets forth no argument regarding the scope of subsection 6108(a)(9) and did not raise this issue before this Court or the trial court. Since we cannot act as Father's counsel, we shall not decide this issue at this time. *See C.H.L. v. W.D.L.*, 214 A.3d 1272, 1277-78 (Pa. Super. 2019) ("We shall not develop an argument for an appellant…; instead, we will deem the issue to be waived.") (citation omitted).

meaning of 23 Pa.C.S. § 6102(a) because the trial court in the PFA matter had concluded Children were not abused just three months earlier. *Id.* at 19-20. He claims Mother abuses the PFA Act to gain advantage in the parties' custody matter, a conclusion he says the trial court made in its August 2019 PFA denial order.[10] *Id.* at 20.

Father's argument that Children could not be included in the PFA Final Order simply because the trial court made a finding in August that Children had not been abused by Father misses the mark. First, as discussed *supra*, a PFA matter is a time-sensitive proceeding; just because the trial court determined Mother did not meet her burden in proving the January 2019 PFA petition does not mean that Mother could not prove that circumstances were different at the time of the November 2019 PFA petition.

Second, Children need not be abused directly or be at risk for abuse directly in order to provide relief to Mother in ways that involve Children. Like Boyfriend and Mother's co-workers, the trial court included Children as other designated persons whom Father is prohibited from stalking and harassing. *See* PFA Final Order, 11/6/2019, at 4. For the same reasons described *supra*

---

[10] Father's latter point is not congruent with the trial court's findings, and is not well taken. Based on the certified record before us, the trial court did not make any sort of finding that Mother was abusing the PFA Act; instead, the trial court merely indicated that while Father did abuse Girlfriend, Daughter's fear and discomfort towards Father regarding his "violent behavior" "should be addressed in a [c]ustody action and not under the [PFA Act]." Trial Court Order, 8/23/2019, at ¶ 17.

as to Boyfriend and Mother's co-workers, the trial court was within its discretion to order this relief regarding Children pursuant to 23 Pa.C.S. § 6108(a)(9).

Furthermore, the trial court's prohibition on Father's ability to go to Children's residence or schools is permitted by the PFA Act.  23 Pa.C.S. § 6108(a)(6) (providing that the trial court may prohibit "the defendant from having any contact with the plaintiff or minor children, including, but not limited to, restraining the defendant from entering the place of employment or business or school of the plaintiff or minor children and from harassing the plaintiff or plaintiff's relatives or minor children.").

Finally, the PFA Act also permits a trial court to award custody relief even if Children were not abused directly.  *See C.H.L.*, 214 A.3d at 1282 (explaining that PFA Act provides for temporary custody relief in domestic violence emergencies because "children who are exposed to domestic violence suffer a torrent of adverse effects regardless of whether they are direct victims of the physical abuse" and the Act "guards against defendants who use children as tools against those seeking protection, even if the children are not themselves physically abused"). The PFA Act permits the trial court to award temporary custody of or establish temporary visitation rights with regard to minor children, again as relief designed to "bring about a cessation of abuse of the plaintiff."  23 Pa.C.S. §§ 6108(a)  Nothing in the PFA Act requires the plaintiff to prove that the defendant abused Children in order to obtain custody

relief pursuant to subsection 6108(a)(4). Stated another way, the PFA Act

does not require the plaintiff to initiate a PFA action on behalf of the plaintiff's

children in order to obtain custody relief.[11] In fact, the PFA Act provides that

"[i]n determining whether to award temporary custody or establish temporary

visitation rights pursuant to this paragraph, the court shall consider any risk

posed by the defendant to the children **as well as risk to the plaintiff**." *Id.*

(emphasis added). The trial court may even award sole custody to a plaintiff

without evidence that Children were abused. *C.H.L.*, 214 A.3d at 1272 ("[T]he

PFA Act does not require a child to be physically struck before a court can

award temporary sole custody to a plaintiff. The court may do so even though

the defendant has inflicted serious abuse upon the plaintiff alone. *See* [23

Pa.C.S.] § 6108(a)(4)(iii)(B).").[12]

---

[11] Although the PFA Act does permit a parent to initiate a PFA action on behalf of minor children, *see* 23 Pa.C.S. § 2106(a), Mother did not do so in the instant PFA petition and is the sole plaintiff.

[12] We note that the PFA Act does require the trial court to make certain findings before it may restrict custody in various ways. *See* 23 Pa.C.S. § 6108(a)(4)(iii)(B) (providing that the trial court "may … deny the defendant custodial access to a child" if "the court finds after a hearing under this chapter that the defendant has inflicted serious abuse upon the plaintiff or a child or poses a risk of abuse toward the plaintiff or a child"); *see also id.* at § 6108(a)(4)(i) (mandating the trial court to restrict custody in certain circumstances). However, because Father does not raise or discuss the propriety of the trial court's temporary custody award in the PFA matter, we do not address whether the PFA Final Order's custody award is in accordance with subsection 6108(a). We also do not address whether the custody provisions in the PFA Final Order are moot or meet an exception. *See C.H.L.*, 214 A.3d at 1279-80 (explaining that custody orders pursuant to the PFA Act are temporary due to a PFA emergency, and even if technically mooted by a

Based on the issue and arguments Father made to this Court, the trial court did not abuse its discretion by ordering relief in the PFA Order that involve Children.

**Custody Appeal at 3445 EDA 2019**

Issue One: *Sua Sponte* Contempt Finding

In Father's Custody Appeal, he raises one issue: "[w]hether the trial court erred as a matter of law and abused its discretion when it violated [Father's] due process rights in holding [Father] in contempt of a temporary custody order and remanding [Father] to the Bucks County Correctional Facility for a period of six months." Father's Brief in Custody Appeal at 5 (unnecessary capitalization omitted).

Father's argument is straightforward: by *sua sponte* finding him in contempt, the trial court violated his right to due process. He notes that neither Mother nor anyone else filed a petition seeking to hold him in contempt. He emphasizes that he had no notice that the trial court would decide a custody matter at the hearing in the PFA matter regarding Mother's petition for a PFA order. He claims he was not afforded the opportunity to present evidence to defend against his alleged contempt of the custody order. In fact, he emphasizes that the trial court did not even bother to reduce its

_____

subsequent custody order in parallel ongoing custody litigation, may meet the capable-of-repetition-but-evading-review exception to the mootness doctrine).

oral contempt adjudication to a written order until after Father appealed. Father's Brief in Custody Appeal at 10-13.

We review custody contempt orders for an abuse of discretion. **K.M.G. v. H.M.W.**, 171 A.3d 839, 844-45 (Pa. Super. 2017). A trial court abuses its discretion in entering a custody contempt order if it misapplies the law, exercises its discretion in a manner lacking reason, or does not follow legal procedure. **Id.**

The Child Custody Act permits the trial court to adjudge in contempt any party who willfully fails to comply with a custody order. 23 Pa.C.S. § 5323(g). The trial court may issue sanctions, including imprisonment for a period of not more than six months, so long as the order specifies the condition by which the party may purge the contempt to be released from jail. **Id.**

When a trial court adjudges someone in contempt of a custody order, five procedural elements are recommended to ensure due process: "(1) a rule to show cause why attachment should issue; (2) an answer and hearing; (3) a rule absolute; (4) a hearing on the contempt citation; and (5) an adjudication." **Harcar v. Harcar**, 982 A.2d 1230, 1234-35 (Pa. Super. 2009). However, all five factors are not mandatory. **Id.** The "essential due process requisites for a finding of civil contempt are notice and an opportunity to be heard." **Id.**

The record confirms Father's summary of events. The trial court *sua sponte* found Father in contempt of the October 22, 2019 custody order

without warning at the conclusion of the hearing regarding Mother's PFA petition. N.T., 11/6/2019, at 60. The PFA matter, while interrelated to the custody matter, is a wholly separate matter on a wholly separate docket. Although the trial court emphasizes in its opinion that during Father's testimony he did not deny Mother's allegation that he sent over 40 texts to Daughter following her testimony at the custody hearing, he also had no indication that he had to defend against a contempt of a custody order in the PFA matter. The trial court immediately concluded the hearing after it announced its contempt adjudication and sanction, giving Father no opportunity to be heard on the custody contempt matter.

In short, Father did not have notice that he was facing a possible contempt finding nor did he have the opportunity to be heard. Thus, the trial court violated Father's right to due process. Accordingly, we vacate the Custody Contempt Order.

## **Comments by the Trial Judge**

Before we conclude, we address one other matter we deem to be of utmost importance, despite neither party's mention of it. At the conclusion of the PFA hearing, the trial court addressed the parties to explain its ruling. In doing so, the trial court made the following comments on the record.

> I had the benefit, for purposes of this hearing, of sitting on a custody case involving these same parties less than a month ago. I'll tell you what I gathered so far, having entered a Temporary Order; **you're a punk, [Father]. You beat on women. Tough guy.**

- 31 -

> **Little blond honey, you're too dumb to leave.** She tells me she was putting money in her 401(k) so she can leave. That's a bunch of crap. Keep on doing that; that 401(k) money will pay for your funeral. **How can you stay with this knucklehead? You have no self-respect.** How many times is he going to beat on you? I don't buy this, "he has a family member that's a police officer." It's just bunk.
>
> So he's a real tough guy when it comes to beating on women. We've seen guys like that. **They have other inadequacies. I'm not going to address them because I'm not an anatomist, but it seems to follow.**
>
> Now, of course, I'm going to grant a PFA. This is threatening.

N.T., 11/6/2019, at 57-58.

It is apparent from the context of the entire hearing that the trial court was referring to Mother as the "[l]ittle blond honey" who was "too dumb to leave" and lacks "self-respect." ***See id.*** And of course the trial court was referring to Father as the "punk," "[t]ough guy," "knucklehead," and "real tough guy" with an "inadequa[te]" penis. ***Id.*** We find these comments to be shocking, sexist, offensive, and egregiously inappropriate by a judge presiding over a PFA hearing.

The comments are irrelevant.[13] The trial court twice asked Mother during the hearing why she had not left Father during their 17-year relationship. ***Id.*** at 11-12. The court's later comments suggest it was not

---

[13] The comments are also largely inaccurate. For example, by the time of the PFA hearing, the evidence in the record indicates that Mother had been separated from Father for almost two years.

- 32 -

asking these questions to assess the credibility of Mother's fear, but rather to pass judgment on her for staying in a relationship with Father. However, the PFA Act protects plaintiffs regardless of whether they leave the relationship, remain in the relationship, or resume the relationship. The trial court's comments evince a fundamental misunderstanding of the dynamics of intimate partner violence,[14] which is of particular concern considering the trial court was presiding over a hearing on that very topic. They also are belittling to Mother, and may serve to discourage victims from seeking help from the judicial system.

The comments also were disrespectful to Father. Although trial judges are human and understandably may be upset by intimate partner violence, all parties deserve to be treated with respect in a court of law. Moreover, such comments by a trial judge may invoke anger or shame in a party who was just adjudged to have engaged in abuse and sanctioned by significant

_____

[14] "It is not uncommon for victims of intimate partner violence to remain with or return to their abusers for a myriad of complicated reasons, such as a dire financial situation; a need for housing; help with co-parenting their children, or assistance with a disability; fear of escalating violence or losing their children; religious or cultural beliefs; and/or distorted thinking and unhealthy reliance upon the abuser created by past abuse." **Commonwealth v. Wilson**, 227 A.3d 928, 940 (Pa. Super. 2020) (citing Why Do Victims Stay?, National Coalition Against Domestic Violence, https://ncadv.org/why-do-victims-stay). In fact, the PFA Act recognizes the complicated nature of the dynamics of intimate partner violence, and explicitly provides that a PFA order remains in effect in the event of subsequent co-residency. **See** 23 Pa.C.S. § 6108(g) ("Resumption of co[-]residency on the part of the plaintiff and defendant shall not nullify the provisions of the court order.").

repercussions such as loss of custody, loss of residence, loss of firearms, restrictions on freedom of communication and movement, etc. The comments may put others at risk of harm or escalation of violence. It is often said that a PFA order is not a guarantee to stop further abuse, and a trial judge should take care not to exacerbate the risk of further harm.

In short, we do not condone the trial judge's comments, and the parties, the public, and the institution of law deserve better from trial judges presiding over hearings under the PFA Act.

## Conclusion

With respect to Father's appeal at Superior Court docket number 3233 EDA 2019, we affirm the PFA Final Order. With respect to Father's appeal at Superior Court docket number 3445 EDA 2019, we vacate the Custody Contempt Order.

Order at 3233 EDA 2019 affirmed. Order at 3445 EDA 2019 vacated. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/7/20

- 34 -