J-A05019-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| SASHA ANN SMITH | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRADLEY KENNETH SMITH | : | |
| | : | |
| Appellant | : | No. 881 WDA 2024 |

Appeal from the Order Entered June 24, 2024
In the Court of Common Pleas of Cambria County Domestic Relations at
No(s): No. 2024-1734

BEFORE: MURRAY, J., KING, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY KING, J.:           **FILED: APRIL 3, 2025**

Appellant, Bradley Kenneth Smith ("Husband"), appeals from the order entered in the Cambria County Court of Common Pleas, granting the petition filed by Appellee, Sasha Ann Smith ("Wife"), under the Protection from Abuse ("PFA") Act.[1]  We affirm.

The relevant facts and procedural history of this case are as follows.  On April 19, 2024, Wife filed a petition seeking a PFA on behalf of herself and the parties' two-year-old child ("Child") against Husband.  In her petition, Wife averred, *inter alia*, that the most recent abuse had occurred two weeks prior when Husband drugged her.  Following an *ex parte* hearing, the court entered a temporary PFA order and scheduled a final hearing for April 26, 2024.  The

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 23 Pa.C.S.A. §§ 6101-6122.

temporary order evicted Husband from the marital residence, gave Wife exclusive custody of Child, and required the relinquishment of Husband's firearms. At the agreement of the parties, the court continued the case for 60 days and removed Child as a protected party.

On June 20, 2024, the court held a final PFA hearing. At the hearing, both parties testified and did not present other witnesses. Following the hearing, the court entered an order, filed June 24, 2024, making a specific finding of abuse and prohibiting Husband from abusing, harassing, threatening, contacting, and/or stalking Wife and possessing any firearms or ammunition. The order further directed that any custody order would govern custody communications and exchanges. Further, the final order lifted the eviction provision of the temporary order, since Wife had relocated to a confidential location.

On July 24, 2024, Husband timely filed a notice of appeal. On July 30, 2024, the court ordered Husband to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. On August 19, 2024, Husband timely complied.

Husband now raises one issue for this Court's review:

> Whether the trial court erred in granting a protection from abuse order when Appellee did not present sufficient evidence for the granting of same?

(Husband's Brief at 4).

"Our standard of review for PFA orders is well settled. In the context of a PFA order, we review the trial court's legal conclusions for an error of law or

- 2 -

abuse of discretion." ***E.K. v. J.R.A.***, 237 A.3d 509, 519 (Pa.Super. 2020)

(internal citation and quotation marks omitted).

> The term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, with the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

***Mescanti v. Mescanti***, 956 A.2d 1017, 1019 (Pa.Super. 2008) (quoting

***Custer v. Cochran***, 933 A.2d 1050, 1053-54 (Pa.Super. 2007) (*en banc*)).

Husband argues that Wife did not prove by a preponderance of the

evidence that she was a victim of abuse as defined by the PFA Act. Husband

asserts that Wife's claim that she had been drugged was supported solely by

speculation. Husband insists that Wife filed for a PFA as a "sword to assist

her in the unfortunate demise of a marriage and in a custody dispute."

(Husband's Brief at 7). Husband concludes that the court abused its discretion

in granting Wife a final PFA order, and this Court must grant relief. We

disagree.

When examining a challenge to the sufficiency of the evidence

supporting a PFA order, our standard of review is as follows:

> When a claim is presented on appeal that the evidence was not sufficient to support an order of protection from abuse, we review the evidence in the light most favorable to the petitioner and granting her the benefit of all reasonable

- 3 -

inference, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it.

*S.G. v. R.G.*, 233 A.3d 903, 909 (Pa.Super. 2020) (quoting *Fonner v. Fonner*, 731 A.2d 160, 161 (Pa.Super. 1999)).

"The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." *E.K., supra* at 519 (quoting *Buchhalter v. Buchhalter*, 959 A.2d 1260, 1262 (Pa.Super. 2008)). The PFA Act defines abuse as follows:

**§ 6102. Definitions**

**(a) General rule.—**The following words and phrases when used in this chapter shall have the meanings given to them in this section unless the context clearly indicates otherwise:

**"Abuse."** The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

(1) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon.

(2) Placing another in reasonable fear of imminent serious bodily injury.

\* \* \*

(5) Knowingly engaging in a course of conduct or

- 4 -

repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S.A. § 6102(a)(1), (2), (5).

"In the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of imminent serious bodily injury…." **Buchhalter, supra** at 1263 (quoting **Raker v. Raker**, 847 A.2d 720, 725 (Pa.Super. 2004)). "The intent of the alleged abuser is of no moment." **Id.** "While physical contact may occur, it is **not** a pre-requisite for a finding of abuse under [Section] 6102(a)(2) of the Act." **Fonner, supra** at 163 (emphasis added). "[T]he victim of abuse need not suffer actual injury, but rather be in reasonable fear of imminent serious bodily injury." **Burke ex rel. Burke v. Bauman**, 814 A.2d 206, 208 (Pa.Super. 2002) (quoting **DeHass v. DeHass**, 708 A.2d 100, 102 (Pa.Super. 1998), *appeal denied*, 557 Pa. 629, 732 A.2d 615 (1998)).

Instantly, the trial court thoroughly discussed the record and testimony as follows:

> In her initial Petition of April 19, 2024, [Wife] enumerates the following as to the most recent incident of abuse, occurring on April 5, 2024 at 6:00 p.m.:
>
> > I believe that [Husband] drugged me. I found a text message on his phone with his friend. He asked if he thought it would mix well with water or tea. The friend told him that he would have to crush it into a powder

and the taste would be recognized if it was not in juice. That night [Husband] prepared a cup of ice water for me to drink with my meal. I do not have recollection of that day or some days following. [Husband] allowed me to look in his phone that is how I found those messages and I took screenshots. Then when I looked at the messages again on 4/18, those specific messages were gone.

[Wife's] 4/19/24 PFA Petition, ¶ 7. As to prior incidents of abuse, [Wife's] Petition details the following:

On March 19th, I have a screenshot of a message where [Husband] asked one of his friends to go by a location to see if I was there.

For a few weeks I was receiving pornographic and sexual messages from unknown numbers. Most recently was March 15th, there were three different numbers in the course of a month. Two of the phone numbers there were explicit photos of a person and their face was not included. It seemed like both photos were the same person. Messages mentioned me wanting to leave my husband, asking for me to send photos, and one was about what I was specifically wearing. I believe this is related to my husband and there is an active case going on as a result of this.

Around March 7th, [Husband] had confronted me in person and asked why I took a specific street home. I thought that he may have had a tracking device on my vehicle, but none were found. I think it is because I drove past that friend's house. Also on this date, he destroyed the blink camera in our home. He was also periodically turning off the wifi in our home to mess with the baby monitor and my work devices when I was working from home.

On February 24th we received a letter in the mail that [Husband] was having an affair. This is when everything started. He accused me of writing the letter and that I was cheating on him and had someone else. He has admitted that he has a problem

with alcohol.

There has been ongoing financial and emotional abuse. He keeps all of his finances private and uses marital funds for pornography and alcohol. He has lied about his location and working late. He lied about going to the bar and said he was doing things for work.

[Wife's] 4/19/24 PFA Petition, ¶ 8.

Two months later, at the June 20, 2024 final hearing, [Wife] testified consistently with her Petition. She first noted that since the filing of her Petition, she and [Husband] were separated, that she moved to a confidential address within Cambria County, and that divorce proceedings were pending. Next, she stated that at the end of February, 2024, she received an anonymous letter stating that [Husband] was having an affair. Shortly thereafter, she began receiving lewd texts from local numbers, containing verbal statements and graphic images, and also requesting photographs and responses from [Wife]. She testified that the messages stated that she was being watched, and commented on her attire. While her home was equipped with Wi-Fi controlled indoor and outdoor security cameras, she stated that [Husband] controlled the Wi-Fi, and interfered with her Wi-Fi and camera access. She added that following the temporary PFA Order, she installed additional cameras; however, [Husband] disconnected those as well.

In March, 2024, [Wife] attempted marital counseling with [Husband]; however, the counselor refused to continue due to the hostile nature of their relationship. Also in March, [Wife] testified to having come home from a four-night training, and that [Husband] had prepared a glass of ice water for her, something that he does not normally do, and which she described as "very out of character." [Wife] believed that perhaps they were "about to turn a corner."

[Husband] provided her with the password to his phone, and permission to view the contents. She viewed messages that [Husband] had exchanged earlier that day with Brock Bodenschatz, [Husband]'s friend and employee, and whom

[Wife] had met socially. While [Husband] was outside, she used her phone to take photographs of the messages. [Husband] inquired of Brock as to whether "they would mix well in water or a cup of [hot] tea," which [Wife] indicated are two beverages that she drinks. [Mr. Bodenschatz] referenced his infant son's medicine, and responded that you would need to "crush it up into a very fine powder, but you would taste it in anything that wasn't like juice," and you "can't put it in soda because it will make it fizz weird." As to context, [Wife] stated that a discussion about [Mr. Bodenschatz's] son's medicine "…doesn't make sense because I'm a parent, and I know that no medication that would be administered to an infant would need to be crushed by a parent or mixed in something like juice because you don't give juice to children under one years old." [Wife] noted her concern, especially as the text specifically inquired about the beverages that she routinely drank. Based upon a time stamp on her phone, [Wife] testified as to taking the picture at 6:30 p.m., after she had drunk the water.

[Wife] indicated that she could not recall the events of that evening, or portions of the following few days, such as being at church. She remembers being very, uncharacteristically tired, and telling [Husband] as much, as well as noting same in journal entries. She stated that she is on two prescriptions, but did not attribute either to causing her memory loss/tiredness. She testified that she does not abuse drugs, and only consumes alcohol socially. Additionally, she expressed belief that, about two weeks later, [Husband] may have drugged the almond milk that she uses to make daily protein shakes, as she was very, very tired in attempting to "get through my workday." Only after this second incident, and following consultation with police, did [Wife] fully put the text message exchange between [Husband] and Mr. Bodenschatz into context, suspecting that she had been drugged by [Husband]. Further, [Wife] indicated that upon asking [Husband] to view his phone a second time, these specific messages had been deleted.

In April, 2024, [Wife] described her relationship with [Husband] as "very tense," "very on edge," and "very stressful." She testified that [Husband] was "very

- 8 -

controlling," noting instances when [Husband] attempted to remove her child's car seat from her vehicle, and having to hide her second set of car keys and change the passcode to her vehicle. She stated that after obtaining the temporary PFA Order, [Husband] was living next door to the marital residence with his mother. [Wife] testified as to [Husband] and his mother frequently watching her, and detailed an instance where, after moving out with the help of friends, [Husband]'s mother followed [Wife]'s friend and drove past [Wife]'s new residence. [Husband] also watched her while she was trying to load the U-Haul. Further, she stated that on the day that she moved out, [Husband]'s brother-in-law "was sent to the residence." Despite advising him that his presence made her uncomfortable, he refused to leave, and only vacated once [Wife] threatened to call the police. She also testified as to an instance during the pendency of the temporary Order where she had a locksmith come to the marital residence to change the locks, as [Husband] had changed them after she relocated. However, the locksmith would not proceed, as [Husband] was next door videoing him from the deck of his mother's porch. For all these reasons, [Wife] requested a final PFA Order, as she is in fear of [Husband].

Thereafter, defense counsel vigorously cross-examined [Wife], raising issues such as [Husband] acting contrary to the text message instructions by giving [Wife] water rather than juice; [Husband]'s increased childcare responsibilities from February to April; [Wife]'s failure to seek medical attention for her condition; [Husband]'s failure to threaten and/or strike [Wife] and her son; and the lack of criminal charges following police investigation of the lewd text messages. At the conclusion of [Wife]'s case-in chief, [Husband] raised a Motion to Dismiss, characterizing the testimony as the unfortunate "ending of a marriage" and mere speculation as to poisoning. [Wife]'s counsel objected to the Motion, noting [Wife]'s testimony as to bodily harm, and that [Wife]'s health resumed after the granting of the temporary Order, as well as the fact that at that juncture, all evidence had to be construed in a light most favorable to [Wife]. [The court] denied [Husband]'s Motion.

[Husband] then took the stand as the sole witness during the defense case-in-chief. [Husband] acknowledged that,

- 9 -

on February 24th, although unbeknownst to him at the time, [Wife] received a letter in the mail stating that he was having an affair. [Wife] asked [Husband] to see his phone, and he obliged. Later that evening, or the next day, [Wife] informed him of the letter. [Husband] denied having an affair. [Husband] testified that from that point until April 5th, anytime [Wife] requested to see his phone, he provided it for her complete review.

During March, [Husband] testified that his relationship with [Wife] was "tense," "lack[ed] a lot of communication," and "felt like you were walking on eggshells with one another." [Husband] denied knowing of his wife's receipt of inappropriate texts and photographs, and stated that he only learned of same once the PFA was issued. While marriage counseling did not work out, [Husband] testified that he began individual counseling at his wife's request.

During April, [Husband] recalled [Wife] going to Pittsburgh for a week on a business trip. As to serving her a glass of ice water upon her return home, he denied that this was unusual behavior, as they "would fill each other's water cups up like every married couple does." Additionally, other than ice cubes, he denied putting anything in her water, including an "illicit substance." As to the text exchanges between he and [Mr. Bodenschatz], [Husband] testified that he was inquiring about [Wife]'s medications, as, because of the hostility in their relationship, he was concerned that she might try to drug him or their child. [Husband] also denied drugging his wife on April 5th, or any subsequent date, and denied slipping something into her almond milk. [Husband] further testified that on April 12th [Wife] asked him for separation, and gave him until April 14th to vacate the residence. [Husband] stated that he refused, indicating that he needed the advice of counsel, and on April 19th, [Wife] filed the PFA.

Finally, [Husband] denied doing anything to violate the PFA. When his mother admitted to following [Wife,] [Husband] testified that he was on the phone with her, yelled at her, and instructed her that they would ascertain what [Wife] took from the house through the divorce proceedings. Overall, [Husband] denied abusing his wife, threatening her, and attempting to hurt her.

- 10 -

On cross-examination, [Husband] admitted to taking a BB gun out of the marital residence on the day that he was permitted to enter to retrieve his belongings. [Husband] further admitted that he did not relinquish same to the Sheriff's department. As to the text exchange between he and [Mr. Bodenschatz], [Husband] testified that prior to asking [Mr. Bodenschatz] about whether "they would mix well in water or a cup of tea," that his previous question, "[a]m I able to swing by [and] pick it up," referred to a pocket knife. Additionally, [Husband] admitted to entering the martial residence and changing the locks during the pendency of the temporary Order, as, upon seeing a moving truck, he believed that [Wife] had moved out. He also admitted to videotaping [Wife] and the locksmith outside of the residence, noting that [Wife] was not in the camera angle, despite standing close to the locksmith.

(Trial Court Opinion, 9/5/24, at 3-10) (some citations to the record omitted).

The trial court found Wife credible and Husband not credible, and concluded that Wife had met her burden of proof, stating:

Even, assuming *arguendo*, that [Husband] did not physically abuse [Wife] by poisoning her, we believe that [Wife] had a reasonable fear of imminent bodily injury. As we stated at the hearing, this finding is supported by the credible evidence of record that we specifically detailed, including [Wife]'s reasonable interpretation of the text exchange, [Wife]'s health following her review of the messages, [Wife]'s relocation to a confidential address, and [Wife]'s demeanor in [c]ourt. Additionally, we rely upon the closing argument of [Wife]'s counsel as to the significance of the uncontroverted evidence regarding [Husband]'s deletion of his text exchange with [Mr. Bodenschatz], and give credence to [Wife]'s evaluation thereof. Further, as outlined by [Wife]'s counsel, we have factored [Husband]'s actions following the issuance of the temporary Order into our credibility determination that we undertook prior to issuing the final Order.

(*Id.* at 12).

- 11 -

The record supports the trial court's conclusion that Wife had proven, by a preponderance of the evidence, that she had a reasonable fear of imminent bodily injury for the reasons detailed above. *See E.K., supra*; *S.G., supra*; *Buchhalter, supra*; 23 Pa.C.S.A. § 6102(a)(2). Husband's argument that Wife's evidence was "speculative" is of no moment where, as here, the trial court made specific credibility determinations supported by the record. *See E.K., supra*; *S.G., supra*; *Mescanti, supra*. The trial court found Wife credible and Husband's testimony incredible, and because the record supports the court's decision, we cannot say it abused its discretion in finding the evidence sufficient to warrant entry of a final PFA order. *See* 23 Pa.C.S.A.§ 6102(a); *Mescanti, supra*. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 4/3/2025