J-A19007-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| VERONICA LEAH BUBB | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NOAH DECAPRIA | : | |
| | : | |
| Appellant | : | No. 1002 MDA 2021 |

Appeal from the Order Entered July 9, 2021
In the Court of Common Pleas of Centre County Civil Division at No(s):
21-1072

BEFORE:   BOWES, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.:                **FILED: SEPTEMBER 28, 2022**

Noah DeCapria appeals from the order granting the petition filed by Veronica Leah Bubb pursuant to the Protection From Abuse ("PFA") Act. We affirm.

The trial court offered the following thorough summary of evidence offered at the PFA hearing:

> In July of 2020, Appellant and [Appellee] began communicating via Facebook Messenger. Within 48 hours of Appellant's initial message, the parties began having a sexual relationship. On July 18, 2020, Appellant asked Appellee to be his girlfriend. Appellee agreed. Almost instantly, Appellee became concerned with Appellant's behavior. Appellant required Appellee to be in constant communication with him, either through text messages or through phone calls. If Appellee was unable to promptly respond to Appellant, he would become angry.

_____

[*] Former Justice specially assigned to the Superior Court.

In addition to his demand for constant communication, Appellant also controlled who Appellee was able to communicate with. Appellee testified that Appellant would block and remove phone numbers from her phone without her knowledge and would access her phone while she slept. Appellee testified that Appellant regularly looked at her phone because he believed he needed to provide her with "guardrails" because she "wasn't acting appropriately." Additionally, Appellant also required access to Appellee's location, which he was able to obtain through the Find My Friends cellphone application. Testimony indicated that Appellant was constantly monitoring Appellee's location to ensure she was remaining faithful and not associating with individuals he deemed to be of bad character. Appellee testified that Appellant would send her screenshots of her location and demand an explanation as to what she was doing and who she was with.

Throughout the parties' relationship Appellant used his position of employment as a means to intimidate Appellee. Appellant has worked in law enforcement for approximately fifteen years. At the time of the hearing, Appellant was employed as an agent for U.S. Customs and Border Patrol in Mechanicsburg, Pennsylvania. Due to his employment, Appellant has access to databases that enable him to obtain personal information of a given individual. Appellee testified that throughout the parties' relationship, Appellant made it clear he had the power to obtain such information at his discretion. For instance, Appellant once sent Appellee a text message containing a photograph of an individual's driver's license and social security card which he obtained through accessing the aforementioned database. The court also heard testimony indicating that Appellant often used these databases to look into individuals Appellee associated with. Appellee testified that Appellant once texted her saying he had to give her "bad news" and stated he had looked up the information of Appellee's friend, who was African, and stated he was not a lawful permanent resident and believed he had likely stolen someone's identification. Appellant testified he accessed this information through the United States Citizenship and Immigration Services website, which is accessible to the public.

Throughout the parties' relationship, Appellant's behavior caused Appellee to fear for her safety. Appellee testified that during the parties' relationship, Appellant had been physically abusive towards her. Specifically, Appellee recalled instances where Appellant dragged her across the bed. Additionally,

Appellee stated Appellant had become "extremely physically violent" during sexual intercourse. In addition to physical abuse, the court heard repeated testimony indicating that Appellant was verbally abusive towards Appellee, calling her a variety of derogatory terms throughout their relationship such as "whore," "slut," and "thot."

Testimony indicated that Appellant also engaged in behavior that, while not inherently abusive, made Appellee fearful of him. For instance, Appellant believed Mexican drug cartels had put a "hit" on him and were seeking retribution against him. In order to provide himself with anonymity, Appellant used the aliases "Rambo D," "Rambo Johnny," "Tony War," and "Rambo Godzilla." Appellee testified that Appellant would answer the door with a firearm. Further, Appellee testified that Appellant would monitor her property at night with a firearm under the belief that criminals were present. The court also heard testimony regarding an incident where Appellant approached a UPS driver on Appellee's property with a firearm.

Appellee testified that she attempted to end the relationship with Appellant numerous times. The parties briefly broke up in December of 2020; however, resumed their relationship on New Year's Eve. Despite reconnecting, the parties' relationship continued to deteriorate. The court heard testimony regarding an incident in February of 2021 where Appellant was in town and wanted to spend time with Appellee; however, Appellee was unavailable due to a veterinary appointment. While waiting outside of the veterinary office, Appellee observed Appellant drive past the office numerous times in an attempt to look for her. Appellee testified that she called Appellant to ask why he was watching her, but Appellant became defensive and stated he was following his GPS. The court also heard testimony regarding an incident in early March of 2021, in which Appellant made statements towards Appellee that if she did not stop her dogs from barking, he would either beat them or shoot them to shut them up.

On March 20, 2021, Appellee ended the parties' relationship for the final time. Appellee testified she immediately changed the passwords on all of her accounts, and blocked him online; however, Appellant began reaching out to her siblings, her ex-husband, and other people in her life. Appellee testified she did not block Appellant's phone number because they needed to

- 3 -

discuss returning one another's property. On March 22, 2021, Appellant sent Appellee an e-mail to her work e-mail address. In the e-mail, Appellant referred to Appellee as a "100% whore or slut" who is "truly possessed" and stated "karma will soon haunt you for your actions."

Appellee did not read the email, and instead forwarded it to her sister and asked if it contained anything that should make her fear for her safety. Two days later, on March 24, 2021, Appellant sent an e-mail to Appellee's ex-husband, stating Appellee had tried to kill [her ex-husband] during their marriage. On March 28, 2021, Appellant called Appellee and stated he was putting all of her belongings outside of his apartment in Mechanicsburg, Pennsylvania, and that if she did not pick them up by that evening he was going to put them in the dumpster. Appellee testified this deeply upset her because she had work equipment, such as a modem and a GPS, at Appellant's residence. Appellee asked her sister, Ariana Windler ("Windler"), to pick up her belongings. Windler testified she lived closer to Mechanicsburg, Pennsylvania than Appellee. Windler testified that when she arrived at Appellant's apartment, there was nothing outside. She then looked over and saw Appellant watching her from inside his apartment, peering behind the curtains. Knowing he was inside the apartment Windler knocked on the door; however, Appellant refused to answer. Appellant then yelled through his apartment door that if she went back to her vehicle he would bring Appellee's belongings outside. Appellant subsequently put Appellee's items in a pile outside his apartment door. As Windler approached the pile, Appellant opened his door and said "where the fuck is my shit," referring to his property left at Appellee's residence. Windler testified she told Appellant she did not know and was only there to pick up her sister's belongings. Appellant then stated if he couldn't get his stuff back than neither could Appellee, and began throwing her belongings back into his apartment.

On April 3, 2021, Appellee received an e-mail from Sam's Club that contained shipping information for a chair Appellant purchased. Appellee forwarded the e-mail to Appellant. On April 4, 2021, Appellee went to Montoursville, Pennsylvania to spend Easter Sunday with her family. Appellee testified that on her way there she saw Appellant drive up in his vehicle at a high rate of speed. Appellee testified she believed it was Appellant because his vehicle has a distinct emblem on the front. Additionally, Appellee testified she believed it was Appellant

because at one point the vehicle drove up next to her and she could see him. Appellee's children were in her vehicle during this incident. At approximately 1:18 p.m., Appellee texted Windler informing her of the incident and stating she believed Appellant would run her off the road if given the opportunity. Initially, Appellant testified he was in Mechanicsburg, Pennsylvania on Easter Sunday. Appellant provided locational data from his iPhone and Apple watch to prove he did not leave the area. Appellant testified that Appellee lied about seeing him because "she probably figured he was going to be at his parents' house on Easter Sunday." However, on the second day of the PFA hearing, Appellant testified he remembered he went to his sister's residence in Lancaster, Pennsylvania to eat lunch with his family that day. Appellant provided an EZ Pass statement that indicated Appellant went through the Gettysburg Pike turnpike at 11:21 a.m. and again at 1:22 p.m. Appellant did not explain why this account differs from the locational data previously provided to the Court.

On April 17, 2021, Appellant sent Appellee's son a gift for his first holy communion. On April 26, 2021, Appellant sent Appellee an e-mail. Appellee had not seen the e-mail until Appellant presented it to her on direct examination. The letter, which refers to Appellee as "Lucifer," states he has destroyed all of her property. The letter is signed "Rambo" and states "I will have my vengeance. In this life or the next."

On or about May 17, 2021, Appellant sent a text message to Windler regarding Appellee's former employer and said "that whore," referring to Appellee, "should come clean." Due to Appellant's continued contact, Appellee reached out to his family and asked them to tell him to stay away from her and her family. In response to Appellee reaching out [to] his family, Appellant sent a text message to Appellee's sister that was directed towards Appellee. The text message stated Appellee was a "whore who's probably sucking some black dude's dick right now if she wants a war and messaging my family members like that they could care less about her. [sic] She might have gotten away with cheating on George with nine different dudes during marriage but I will soon get my vengeance in this life or the next. Karma will haunt that whore to come." Appellee testified this made her extremely frightened.

On May 25, 2021, an employee of Kissinger Bigatel & Brower Realtors received a call from an individual who was inquiring about whether a property that Appellee had purchased was being put back on the market. The employee informed real estate agent, Carrie Miller ("Miller"), who has worked with Appellee over the years on several home purchases. Miller called Appellee to notify her of the inquiry. Appellee provided Miller with Appellant's phone number and asked whether that was the individual who called. It was. Miller testified that this information made Appellee fearful. Appellant testified he contacted Kissinger Bigatel & Brower Realtors because he was potentially getting a job in the area.

On May 26, 2021, Appellee's daughter accidentally sent a text message to Appellant that contained an image of a sea dragon carrying its babies. Windler testified that she was helping Appellee's son with his homework that evening which required printing out a photograph of a sea dragon. Windler testified Appellee's daughter, who was approximately nine years old at the time, accidentally sent the image to Appellant while trying to print it. Testimony indicates that Appellant interpreted this [as] a threat, testifying that it was one of "the most sickest things of all."

Appellee testified that besides the conversation arranging the return of her property and the e-mail she forwarded to Appellant regarding a chair he purchased, she has not communicated with him since March 20, 2021. On May 27, 2021, Appellee filed a petition for PFA against Appellant which was subsequently granted by this court that same day. A temporary PFA against Appell[ant] was entered by the court until the time of hearing.

Trial Court Opinion, 11/5/21, at 2-8 (cleaned up).

Following a hearing at which the above evidence was adduced, and Appellant proceeded *pro se*, the trial court entered an order prohibiting Appellant from abusing, harassing, stalking, or contacting Appellee for three

years. Appellant thereafter hired counsel, who filed a timely notice of appeal.

Both Appellant and the trial court complied with Pa.R.A.P. 1925.[1]

Appellant presents the following questions for our consideration:

1.   Did the court err in finding that abuse was present to support the entry of a Protection from Abuse Order where there was no evidence of sexual assault?

2.   Did the court err in finding that abuse was present to support the entry of a Protection from Abuse Order where there was no evidence of physical abuse?

3.   Did the court err in finding that abuse was present to support the entry of a Protection from Abuse Order where there was no evidence of false imprisonment?

4.   Did the court err in finding that abuse was present to support the entry of a Protection from Abuse Order where there was no physical or sexual abuse of children?

5.   Did the court err in finding that abuse was present to support the entry of a Protection from Abuse Order where there was no evidence of a course of conduct which placed the plaintiff in fear of bodily injury?

Appellant's brief at 4-5.

We begin with a review of the applicable legal principles. "Our standard of review for PFA orders is well settled. In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion." *E.K. v. J.R.A.*, 237 A.3d 509, 519 (Pa.Super. 2020) (cleaned up).

---

[1] Appellant did not comply with the trial court's initial Pa.R.A.P. 1925(b) order. However, as counsel was not served with the order, the court vacated the initial order and afforded Appellant thirty days from the receipt of the hearing transcripts to file his Rule 1925(b) statement. Appellant thereafter complied.

An abuse of discretion is not "a mere error in judgment; rather, an abuse of discretion occurs where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias, or ill will." *Kaur v. Singh*, 259 A.3d 505, 509 (Pa.Super. 2021)

In the context of the PFA Act, "[a]ssessing the credibility of witnesses and the weight to be accorded to their testimony is within the exclusive province of the trial court as the fact finder." *S.G. v. R.G.*, 233 A.3d 903, 907 (Pa.Super. 2020) (cleaned up). "[T]he trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Kaur*, *supra* at 509 (cleaned up). Accordingly, "we review the evidence of record in the light most favorable to, and grant all reasonable inferences to, the party that prevailed before the PFA court." *Id*.

It is well-established that "the purpose of the PFA act is to protect victims of domestic violence from the perpetrators of that type of abuse and to prevent domestic violence from occurring." *Diaz v. Nabiyev*, 235 A.3d 1270, 1272 (Pa.Super. 2020) (cleaned up). To prevail, a PFA petitioner must prove by a preponderance of the evidence that abuse contemplated by the Act occurred. *See*, *e.g.*, *K.B. v. Tinsley*, 208 A.3d 123, 128 (Pa.Super. 2019) ("A petitioner is not required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence."). The

petitioner need not present corroborating evidence of the alleged abuse of resultant injuries, rather "[a] PFA petitioner's testimony alone, if believed by the trial court, may constitute sufficient evidence of abuse." *E.K. v. J.R.A.*, *supra* at 523.

Abuse is defined in the Act as follows, in relevant part:

The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

(1) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon.

(2) Placing another in reasonable fear of imminent serious bodily injury.

(3) The infliction of false imprisonment pursuant to 18 Pa.C.S. § 2903 (relating to false imprisonment).

(4) Physically or sexually abusing minor children, including such terms as defined in Chapter 63 (relating to child protective services).

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S. § 6102(a).

Having set the legal landscape, we turn to Appellant's contentions. We initially observe that, although Appellant presents five separate issues to this

Court, he really only has one argument: that the trial court erred in entering the order because the evidence did not support any definition of abuse. ***See*** Appellant's brief at 12 ("The testimony presented at the hearing on the matter did not establish any of the requirements to justify a [PFA] Order."). Indeed, most of Appellant's issues set up and knock down straw men by establishing that Appellee did not prove types of abuse that she never alleged in the first place. ***See id***. at 13-18. Rather than address Appellant's issues *seriatim*, we proceed directly to the actual question: whether Appellee proved by a preponderance of the evidence that Appellant knowingly engaged in a course of conduct or repeatedly committed acts toward Appellee, including following her, such that she was placed in reasonable fear of bodily injury, warranting protection from abuse pursuant to 23 Pa.C.S. § 6102(a)(5).

The trial court explained its finding of abuse as follows:

> Upon review of Appellee's extensive credible testimony, the court concludes there clearly exists sufficient evidence to find, by a preponderance of the evidence, that Appellant engaged in a course of unauthorized conduct that caused Appellee to reasonably fear for her safety. As discussed, Appellee testified that Appellant dragged her across the bed numerous times during their relationship and stated he had become "extremely physically aggressive" with her during sexual intercourse. Additionally, considerable testimony was presented regarding the verbal abuse Appellant directed towards . . . Appellee that often contained threats of vengeance. The court found it reasonable for Appellee to be fearful of Appellant based on his prior actions coupled with his training in various law enforcement tactics. Further, the court found the testimony of Appellee that Appellant had a pattern of domineering and controlling behavior both during and after their relationship to be credible.

- 10 -

The court does not find substantial portions of Appellant's testimony credible. Moreover, the court finds that throughout the two[-]day hearing Appellant displayed concerning behavior that corroborated Appellee's testimony and further emphasized the need for a PFA order. Appellant testified that Appellee filed a PFA against him because she is obsessed with him and wants "retribution" for breaking up with her. Appellant testified that since the parties' break up, he has only contacted her three times. Appellant acknowledged e-mailing Appellee on March 22, 2021, e-mailing Appellee's ex-husband on March 24, 2021, calling Appellee on March 28, 2021, sending a gift to Appellee's son on April 17, 2021, sending Appellee an e-mail on April 26, 2021, sending a text message to Appellee's sister on May 17, 2021, and calling Appellee's realtor on May 25, 2021. However, Appellant believes that because not all of these communications were sent directly to Appellee, who had blocked him, they don't count.

Throughout his testimony, Appellant mocked Appellee for being afraid of him and made innumerable insults directed towards her. Specifically, Appellant referred to Appellee as a Satan-worshiping liar who lives a "criminal life." Appellant testified he tried to "counsel" Appellee numerous times to "be a better person" but "she's a person you cannot change." Appellant testified that Appellee is "money hungry" and only filed a PFA against him to benefit financially. However, the court notes that Appellee is only seeking an award of attorney's fees while Appellant is requesting $45,691 in damages. Appellant also made disparaging remarks towards Appellee's family. Specifically, Appellant testified that he has "more integrity than [Appellee's] entire bloodline combined" and that unlike his family, who has "strong Italian values," Appellee's family has "nothing going for them."

Appellant testified that he "is the most respected law[-] abiding person" and that "as a law enforcement officer he always does the right thing." Regarding his employment, Appellant repeatedly referenced the importance of his position as an agent for Customs and Border Patrol and discussed his "top level security clearances" that allows him to access "so much technology" it would ma[ke] a layperson's "head spin." Appellant testified that if the court does not dismiss the PFA order against him, the United States in its entirety would suffer because "anything that comes into the country," such as "people, vehicles, cargo, or guns," must be first cleared by him. The court finds it corroborates Appellee's

- 11 -

> testimony that Appellant used his employment as a mechanism to intimidate and control her.

Trial Court Opinion, 11/5/21, at 9-10 (cleaned up).

Appellant levies the following attacks upon the trial court's findings. He indicates that the evidence showed only two instances of stalking, one of which was disproved by Appellant's EZ Pass record and the testimony of his mother, and the other of which was disproved by his own testimony. *See* Appellant's brief at 19-20. Appellant further asserts that most of the allegations of harassment occurred after the final breakup, claims that the verbal assaults were "minor," and cites his own testimony to explain why they were legitimate communications. *Id*. at 20-22. Appellant argues that his testimony about his work, while "admittedly arrogant and pompous," was not a legitimate ground to find that Appellant uses his position to intimidate, contending that the documentary evidence supported only one instance of his using a non-public database to access information on Appellee's associates. *Id*. at 22. Appellant sums up by insisting that, "[o]n the whole, the record does not establish anything more than a messy break-up." *Id*. at 23.

Appellant's arguments are devoid of merit. First, where, as here, the trial court's factual findings are supported by the record, this Court will not disturb them based upon challenges to the court's credibility determinations or weighing of the evidence. *See*, *e.g.*, *S.G. v. R.G.*, *supra* at 907. Thus, Appellant's assertions that his evidence should have been accepted over Appellee's testimony are unavailing.

Second, Appellee testified not only to disturbing stalking behaviors by Appellant before and after their relationship ended, but also described past exhibitions of violence by Appellant that reasonably caused her to be in fear of future bodily injury. **See E.K. v. J.R.A.**, **supra** at 522 ("Because the goal of the PFA Act is to prevent physical and sexual abuse, a victim does not have to wait for physical or sexual abuse to occur for the PFA Act to apply, and past acts are relevant to determine the reasonableness of the petitioner's current fear.").

Third, Appellee's testimony, accepted as credible by the trial court, establishes far more than two instances of stalking. Instead, it demonstrates that Appellee was under Appellant's constant watch since the time the two commenced their relationship, and that she reasonably feared that the stalking and harassment he engaged in after the breakup would continue absent court intervention. **See** Trial Court Opinion, 11/5/21, at 9-10.

Hence, rather than merely evincing a messy break-up, as Appellant maintains, the certified record bespeaks the very type of abusive conduct for which the PFA Act was designed to provide protection. **See**, **e.g.**, **K.B. v. Tinsley**, **supra** at 128–29 (holding abuse was established where the defendant testified to feeling threatened because during the relationship used a kitchen knife to stab an air mattress while calling the petitioner "a whore" and "a bitch," and after she ended the relationship, he repeatedly texted her, came to her house uninvited, and seemed to be tracking her movements); **T.K. v.**

***A.Z.***, 157 A.3d 974, 977 (Pa.Super. 2017) (affirming PFA order pursuant to § 6102(a)(5) where the defendant repeatedly followed the petitioner in his vehicle and at local establishments, kept track of her whereabouts, and regularly drove past her home, and the petitioner testified that she lived in constant fear of him).

Finally, we observe that Appellant's insistence that his behavior was normal and the described incidents were minor exposes Appellant's continuing failure to appreciate that his conduct was even inappropriate, let alone abusive. This further confirms the trial court's determination that Appellee is in ongoing need for protection. Accordingly, we affirm the trial court's July 9, 2021 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/28/2022

- 14 -