J-S24016-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| S.A.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| C.A.B. | : | No. 67 MDA 2023 |

Appeal from the Order Entered December 14, 2022
In the Court of Common Pleas of Schuylkill County Civil Division at
No(s): A-331-22

BEFORE: BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.: **FILED: SEPTEMBER 12, 2023**

S.A.B. (Stepmother) appeals from the order, entered in the Court of Common Pleas of Schuylkill County, denying her petition seeking a protection from abuse (PFA) order on behalf of minor-child, E.B. (born July 2011), against E.B.'s Father, C.A.B. (Father). After review, we affirm.

On November 11, 2019, Stepmother filed a petition for a temporary PFA order on behalf of herself and, her stepson, E.B. Stepmother had resided with E.B. and Father for at least five years prior to the time she filed the PFA petition. **See** PFA Petition, 11/9/22, at 2.[1] The PFA petition alleges, in

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Stepmother has standing to seek a PFA order on behalf of herself and minor child, E.B. **See** 23 Pa.C.S.A. § 6106(a) (providing "[a]n adult [] may seek relief under this chapter for that person . . . [and an] adult household member [] may seek relief under this chapter on behalf of minor children [] by filing a petition with the court alleging abuse by the defendant.").

relevant part, that on "Halloween night[, October 31, 2022, Father] grabb[ed E.B.'s] neck and shoved him and made [E.B.] run [because Father did] not get[] want he want[ed]. [E.B.] is afraid of [Father] and the house is infested with roaches and [] has dog feces and [] urine all over[. Father] also does drugs around [E.B]." *Id*. On November 9, 2022, the trial court held an ex-parte hearing pursuant to 23 Pa.C.S. § 6107(b), after which it entered temporary PFA orders on behalf of Stepmother and E.B.[2]

On December 14, 2022, the trial court held a final PFA hearing. During the hearing, Father and C.M., a volunteer fireman who served as crossing guard on the night in question, testified regarding the Halloween incident alleged in the PFA Petition. B.M., E.B., S.B., B.P.,[3] and Father also testified at the hearing with regard to an incident ("truck incident") that occurred after the PFA petition had been filed, in which Father allegedly drove his truck at a high rate of speed while in close proximity to E.B. while near E.B.'s school.

C.M. testified that, as he was serving as a crossing guard on Halloween night, he saw Father touch E.B. *Id.* at 58. C.M. testified,

> I was standing there and they were all gathered together as a family and [E.B.] went to go and [Father] grabbed ahold of [E.B.] and pulled him back. . . . I wouldn't say [it was an] appropriate

---

[2] On March 1, 2019, Stepmother was granted a temporary restraining order against Father. However, Stepmother failed to appear at the final PFA hearing on March 13, 2019, and the trial court dismissed the petition. *See* PFA Petition, 11/9/22, at 2.

[3] B.M. is a teacher at E.B.'s school. Stepmother is the mother of S.B. and B.P., neither of whom are Father's biological children.

[touching], but it was like[,] get back here[,] more or less. . . . [Father] didn't hurt [E.B.]  He [] grabbed [E.B.] by the arm and [] pulled him back a little.  [Father] did yell a little bit. . . .  [E.B.] did cry a little bit.  [E.B] let out a yell.

*Id.* at 58-59.

Father testified that on Halloween night he went trick or treating with Stepmother and Father's five children, including E.B.  *Id.* at 60.  He "grabbed [E.B.] because [Stepmother] was trying to take him[.  He] told [Stepmother] that she wasn't going to get [E.B.], so [he] grabbed [E.B.,] took him[,] and [] told him to run because [Stepmother] was trying to grab him."  *Id.* at 61; *see id.* (Father testifying he grabbed E.B.'s arm and denied hitting E.B.).

B.M. was the first to testify regarding the truck incident.  She was parking her car on Mill Street, in St. Clair Borough, about half a block from E.B.'s school, when she saw a male driving a truck behind her.  *Id.* at 7-8.  B.M. parked her own car and the truck "stomped on the gas and took off at [] a high rate of speed[, and] seemed to be in a big hurry."  *Id.* at 7; *see id.* at 9 (B.M. testifying truck traveled substantially over 15 miles per hour).[4]  B.M. testified that the truck disregarded a stop sign and then she lost sight of the vehicle.  *Id.* at 7, 12.  Upon exiting her vehicle, B.M. saw "[E.B.] running down the street screaming and crying."  *Id.* at 12; *see id.* (B.M. characterized E.B.'s scream as "traumatic"); *id.* at 15 (B.M. testifying she did not know E.B. until day in question).  B.M. conceded that she did not see E.B. as the truck passed

_____

[4] In Pennsylvania, school zone speed limits are 15 miles per hour.  Although B.M. testified that she was unsure whether the incident occurred within the school zone, 15 miles per hour was provided as a reference to discuss the speed at which Father had been operating his truck.  *Id.* at 8-9.

him and that she did not see anybody dodging or flying out of the way to avoid the truck. *Id.* at 10-11, 14.

Next, E.B. was called to testify. Marc Lieberman, Esquire, counsel for Stepmother, stated, "[E.B.] is a minor child, so I would suggest that the courtroom [] be cleared." *Id.* at 18. The trial court denied the request, reasoning, "The only staff in the courtroom, other than the next two litigants, are court staff. No, I'm not having court staff leave my courtroom. The two litigants from the other hearing I don't think have any impact on this child. No, I'm not going to do that." *Id.* Attorney Lieberman responded, "Uh -- " and then E.B. took the stand. *Id.*

E.B. testified that while he was standing on the sidewalk near his school, he saw Father driving his black truck. *Id.* at 20-21; *id.* at 26 (E.B. testifying other children also on sidewalk and no crossing guard present). E.B. testified "I was walking to school and I s[aw] the truck go by and [it] made a U-turn and I was running and I s[aw] a flash go by and I . . . ." *Id.* at 22. Thereafter, the court told E.B. to "Take a deep breath." *Id.*

E.B. testified that he was afraid when the truck was coming towards him and that the truck was moving quickly. *Id.* E.B. failed to respond when asked how close the truck was when it was coming toward him. Attorney Lieberman stated, "I think the child is a little bit overtaken. Perhaps we can [give him] a moment to have a sip of water or . . . just relax for a few minutes." *Id.* at 23. E.B. accepted the water. *Id.* Attorney Lieberman then asked, "[I]s it

okay if I start asked you [questions]?" and E.B. responded in the affirmative.

***Id.*** at 24.  Thereafter, the following exchange took place:

> [Attorney Lieberman]:  And did [] the vehicle slow down at all when it was coming at you or was it still moving at a high rate of speed?
>
> [E.B.]:  (no response from the witness)
>
> [Court]:  If you don't remember, you can tell us.
>
> [Attorney Lieberman]:  Is it that you don't remember what happened or is there some other reason why you're not telling us what happened?
>
> [E.B.]:  (no response from the witness)
>
> [Attorney Lieberman]:  Are you afraid of anybody in this courtroom right now?
>
> [E.B.]:  (no response from the witness)
>
> [Attorney Liberman]:  Do you just feel like not talking and you don't want to tell the Judge what happened? . . . I'm not going to pursue this, Your Honor.

***Id.*** at 24-25.

The court inquired as to whether James Heidecker, Esquire, counsel for Father, had any questions for E.B.  Attorney Heidecker stated that he had "a couple of questions" and began cross-examination of E.B.  ***Id.*** at 25.  E.B. testified that he had been living with Father and Stepmother until around October 2022, and currently lives with Stepmother.  ***Id.*** at 25.[5]  E.B. testified that as the truck drove by, he saw Father's face and Father did not say

---

[5] Throughout cross-examination, E.B. responses consisted of mainly "yes" or "no" answers.  E.B. did not provide a precise date as to when Father stopped living in the residence with E.B. and Stepmother.

anything to him. *Id.* at 27-28; *id.* at 27 (E.B. testifying truck did not swerve). E.B. testified that he is not afraid of Stepmother. Attorney Heidecker twice asked E.B. whether E.B. was scared of Father. The first time, E.B. was silent in response. The second time, E.B. responded, "I don't know." *Id.* at 30. E.B. also testified that he went over the case with Stepmother prior to today's hearing and Stepmother went over what E.B. should say. *Id.* at 29; *see id.* (E.B. responding affirmatively when asked whether there is a lot of friction between Stepmother and Father; Stepmother and Father are not getting along); *id.* at 28 (E.B. testifying it is tough to be away from Father).

S.B., who attends the same school as E.B., witnessed the truck incident. S.B. testified that

> [Father] was speeding down the road and he was slowing down to talk to [me and E.B.] . . . [Father] said "I'll see you later (kissing sound)." . . . And like the kid I am, I made fun of that. . . . And then I realized that [Father] almost hit [E.B.] with his truck.

*Id.* at 33; *id.* at 35 (S.B. testifying Father acted "how he always acts . . . [r]ude."). E.B. was "scared" and screamed. *Id.* at 34. S.B. stated that E.B. was also upset and cried when Stepmother came to the school. *Id.* at 35.

B.P. testified that he saw Father's truck "keep driving without stopping," and that "[Father] was [] an inch away from [E.B.]; and then that's when [B.P.] told [E.B.] to run to the school because that's where the teachers are." *Id.* at 46; *see id.* (B.P. testifying E.B. in danger due to Father's truck). B.P. testified that Father slowed down a little bit when he was close to E.B. but was still going fast. *Id.* at 48; *id.* at 47 (B.P. testifying, "Everyone goes [] the

speed limit, expect for [Father's] truck. It went over the speed limit"). B.P. also testified that Father stopped at the stop sign. *Id.* at 48. B.P. explained that Father has a temper; "he has lots of them." *Id.* at 49; *see id.* (B.P. has seen Father lose his temper and has given B.P. a nosebleed).

Father testified that he was driving his truck a block away from the school and he did not try to run over any child. *Id.* at 62; *see id.* at 63 (Father testifying witnesses were "lying;" Father did not drive at high rate of speed); *id.* at 66 (Father testifying he was within 10-15 yards of E.B.); *id.* at 64. Father explained, "I was half a block away [from E.B.] and he s[aw] my truck and he ran across the street. By the time I would get to where he was, he was already halfway down the block. . . . I did make a U-Turn." *Id.* at 65. Father testified that the child witnesses lied because "[Stepmother] tell[s] them to do things. They do what [Stepmother] says. So does [E.B.]" *Id.* at 64.

Following the witnesses' testimony, the court entered a final PFA order on behalf of Stepmother, but denied the same with regard to E.B. The court then stated, "You people [have] a lot of [] problems [] that are custodial in nature" and declined to make a ruling regarding custody. *Id.* at 67. Stepmother timely appealed. Both she and the trial court have compiled with Pa.R.A.P. 1925.[6]

_____

[6] The record in this matter was transmitted to this Court prior to the transcription of the notes of testimony. The trial court wrote its initial option
*(Footnote Continued Next Page)*

Stepmother raises the following questions for our review:

1. Whether the [t]rial [c]ourt erred and abused its discretion in dismissing [Stepmother's] motion for the courtroom to be cleared of a considerable number of persons who were witnesses in unrelated cases, other litigants, and unknown persons in the courtroom when young, child witnesses were testifying, including the child victim.

2. Did the [t]rial [c]ourt err in not having appropriate safeguards in place when child witnesses or child victims are testifying in general. In this case, the child victim was in obvious and mortifying distress when being forced to testify in front of total strangers in the courtroom, whilst testifying from the witness stand.

3. Did the [t]rial [c]ourt err in allowing the alleged perpetrator in the case to stare at the victim intensely and menacingly from a distance of just a few feet. Did the [trial c]ourt fail to ensure that a proper, appropriate, protected, and closed forum was provided as the child victim/witness[] was almost fully dumbstruck, and the [c]ourt failed to either recognize that, or remedy that.

Appellant's Brief, at 4.[7]

This Court's standard of review of PFA orders is well settled.

In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion. The PFA Act does not seek to determine criminal culpability. A petitioner is not

_____

from memory. Upon receipt off the transactions, the trial court filed a supplemental opinion with substantially the same analysis and conclusion. ***See*** Trial Court Supplemental Opinion, 3/9/23, at 1.

[7] We note that Stepmother failed to follow the briefing requirements of Pa.R.A.P. 2119(a), placing her argument for all three claims under one argument heading. ***See*** Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point therein[.]").

required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence.

***E.K. v. J.R.A.***, 237 A.3d 509, 519 (Pa. Super. 2020).

S.A.B first claims that the trial court erred in denying her request to clear the courtroom of a considerable number of individuals, some of whom were witnesses in unrelated cases, and also of Father, of whom E.B. was "palpably terrified and frightened." ***See*** Appellant's Brief, at 13-14. Specifically, Stepmother argues that the record and trial court opinion only reflect the "spoken record of the hearing," but fail to convey that prior to entering the courtroom, E.B. was "determined" to testify and that E.B.'s demeanor was altered as he entered the courtroom to see "numerous, unknown individuals" as well as "his alleged abuser[ only ten feet away.]" ***Id.***

At the hearing, the trial court denied Stepmother's motion to clear the courtroom, reasoning that only two litigants from an unrelated case were present. ***See*** N.T. Final PFA Hearing, ***supra*** at 18. In its opinion, the trial court concluded that although the courtroom was "full," the "hearing arena in [the instant courtroom] is removed from the area where the other awaiting litigants were located" and "nothing in [Stepmother's statement], nor anything of record, indicates that the other people in the courtroom in any way affected [E.B.'s] testimony." Trial Court Opinion, 2/23/22, at 4. We agree.

Instantly, Attorney Lieberman **only** requested the courtroom be cleared due to E.B.'s status as a minor child. ***See*** N.T. Final PFA Hearing, ***supra*** at 18. Stepmother cannot now make an entirely new argument alleging that

E.B. was terrified of Father as evidenced by E.B.'s demeanor changing upon entering the courtroom. Moreover, E.B. may have been silent while testifying for a multitude of reasons, including that Stepmother and Father were not getting along, that E.B. disagreed with what Stepmother believed E.B. should say, or that it has been hard for E.B. being away from Father. ***See id.*** at 28-29.

In light of the foregoing, the trial court did not err in denying Stepmother's motion to the close the courtroom.

Next, Stepmother argues that the trial court failed to have in place appropriate safeguards during E.B.'s testimony. Specifically, Stepmother claims that Attorney Lieberman, who had a clear view of E.B. during his testimony, saw that E.B. was "palpably dumbstruck and appeared **terrified**." Appellant's Brief, at 15 (emphasis in original). Stepmother also claims that while E.B. was testifying, Father was "glaring menacingly at the eleven-year-old child." Stepmother is afforded no relief.

The trial court stated, "had there been any action by [Father] to inhibit the testimony of E.B.[,] it would have been immediately remedied. Nor did [Attorney Lieberman] raise this concerning observation during proceedings. This is just simply not what occurred, and [Attorney Lieberman's] assertions are inaccurate." Trial Court Opinion, 2/23/23, at 5.

During E.B.'s testimony, Stepmother failed to place on the record any objection or statement regarding Father's alleged menacing glare. Moreover, pursuant to Pa.R.E. 611, the court should exercise reasonable control over the

mode and order of examining witnesses so as to "make those procedures effective for determining the truth" and "protect witnesses from harassment." Pa.R.E. 611(a)(1), (2). Here, however, the transcript contains no indication that Father's presence or conduct influenced E.B.'s testimony. Without any record evidence that Father's conduct inhibited E.B. from testifying fully and truthfully, we are constrained to conclude that the trial court did not err in failing to employ any safeguards.

Finally, Stepmother argues that the trial court failed to *sua sponte* consider an in-camera hearing for E.B.'s testimony, with or without both parties' counsel present. *Id.* at 14. Stepmother relies on 42 Pa.C.S.A. §5985(a) (testimony of minor-victim may be transmitted by contemporaneous alternative method, i.e., closed caption television) to support her argument. Appellant's Brief, at 16. She states that although "closed-circuit child testimony should not be automatic in every PFA case[,] . . . . [section 5985] provides that **the court must first determine** whether testifying [] in an open forum in the defendant's presence will result in [emotional distress.]" *Id.* at 17 (emphasis added). Stepmother concludes that "it should not be the responsibility of a party to ensure that [] the truth[-]telling process properly functions." *Id.* We find this claim waived.

During the hearing, Stepmother failed to request that E.B. testify by a contemporaneous alternative method and failed to place an objection on the record as to her belief that the trial court was required to raise this issue on its own. We also note that Stepmother failed to object when Attorney

Heidecker proceeded with cross-examination of E.B, even though E.B. was allegedly "terrified."  If raised at the hearing, the trial court could have ordered that E.B. testify without Father present.   Accordingly, we find this claim waived.  ***See Interest of DC***, 263 A.3d 326, 334 (Pa. 2021) ("this court will not consider a claim of error when an appellant fails to raise the claim in the trial court at a time when the error could have been corrected"); ***see also*** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal").

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/12/2023