J-S20003-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| DAKOTA CHEYANN JOHNSTON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JEFFREY A. ROSENHECK | : | |
| | : | |
| Appellant | : | No. 1662 MDA 2023 |

Appeal from the Order Entered October 25, 2023
In the Court of Common Pleas of Bradford County Civil Division at No(s):
2023FC0340

BEFORE:   OLSON, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.:                    **FILED: AUGUST 20, 2024**

Appellant, Jeffrey A. Rosenheck, appeals *pro se* from the October 25, 2023 order entered in the Court of Common Pleas of Bradford County that granted a petition filed by Dakota Cheyann Johnston ("Johnston") seeking a final order under the Protection From Abuse ("PFA") Act, 23 Pa.C.S.A. §§ 6101-6122.  We affirm.

The record reveals that, on October 10, 2023, Johnston filed a petition seeking a PFA order against Appellant based upon allegations that Appellant was "obsessed" with Johnston and that after Johnston ended their relationship, due to a physical altercation, Appellant, *inter alia*, continued to contact her, and her family members, *via* text messages sent using his cellular telephone.  **See generally**, Petition for PFA, 10/10/23.  The trial court granted

---

[*] Former Justice specially assigned to the Superior Court.

a temporary PFA order against Appellant on October 11, 2023. Upon proper notice to Appellant, the trial court held a hearing on the matter on October 24, 2023.[1] On October 25, 2023, the trial court granted Johnston's request for a final PFA order.[2]

On November 9, 2023, Appellant appealed *pro se* the trial court's October 25, 2023 order granting the final PFA order. On November 16, 2023, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). On December 4, 2023, Appellant filed *pro se* a document captioned "affidavit of appeal," which the trial court accepted as Appellant's Rule 1925(b) statement. **See** Trial Court Opinion, 12/15/23, at 1 (stating, "[i]n his [Rule 1925(b) statement, Appellant] is less than concise").

A liberal reading of Appellant's "Rule 1925(b) statement" reveals that he challenges the sufficiency of the evidence introduced to support the trial court's finding of abuse as a necessary element of the issuance of a final PFA order.[3] **See** Appellant's *Pro Se* Affidavit of Appeal, 12/4/23, at 1 (stating, "[w]ithin this statement, it will be shown that the circumstances do not meet

---

[1] Appellant was represented by counsel at the PFA hearing.

[2] The final PFA order was dated October 24, 2023, but was entered on the trial court docket on October 25, 2023.

[3] **See** Pa.R.A.P. 1925(b)(4)(ii) (stating, the Rule 1925(b) statement "shall concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the [trial court]").

one or more of the acts listed [in Section 6102(a) of the Domestic Relations Code that constitute "abuse" for purpose of the issuance of a PFA order]); *see also id.* at 2 (stating, "[g]iven the facts of the case, a permanent [PFA order] should not [have been] granted against [Appellant] as there is not cause of concern of abuse as defined by law"); *Elliot-Greenleaf, P.C. v. Rothstein*, 255 A.3d 539, 542 (Pa. Super. 2021) (reiterating that, this Court may liberally construe a *pro se* party's filing, but the *pro se* party is not entitled to any particular advantage because he or she lacks legal training).

Our standard and scope of review for a challenge to the sufficiency of the evidence is well-settled.[4]  "In the context of a PFA order, we review the

_____

[4] Pennsylvania Rule of Appellate Procedure 2111 states that an appellant's brief shall consist of, *inter alia*, a statement of jurisdiction, a statement of our scope and standard of review, a statement of the question(s) involved, a statement of the case, a summary of the argument, and an argument section. Pa.R.A.P. 2111(a).  The argument section "shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part - in distinctive type or in type distinctively displayed - the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent."  Pa.R.A.P. 2119(a).  Pennsylvania Rule of Appellate Procedure 2101 requires that all briefs "conform in all material respects with the requirements of [the appellate rules of procedure.]"  Pa.R.A.P. 2101.  If the defects in the brief are substantial, this Court has the discretion to quash or dismiss the matter.  ***Id.***

On February 6, 2024, Appellant, in the case *sub judice*, filed with this Court an "affidavit for appeal" that does not contain any of the aforementioned required components for an appellant's brief.  ***See*** Pa.R.A.P. 2111(a); ***see also*** Appellant's *Pro Se* Affidavit for Appeal, 2/6/24.  Nonetheless, in Section 5 of Appellant's affidavit for appeal, he sets forth each pertinent statutorily defined act which constitutes "abuse" in the context of a PFA order (***see*** 23 Pa.C.S.A. § 6102(a)), as well as a brief argument in support of his sufficiency

trial court's legal conclusions for an error of law or abuse of discretion." ***E.K. v. J.R.A.***, 237 A.3d 509, 519 (Pa. Super. 2020) (citation and original quotation marks omitted).

> [W]e review the evidence in the light most favorable to the petitioner and[,] granting her[, or him,] the benefit of all reasonable inferences, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it.

***Id.*** (citation omitted). "A preponderance of the evidence standard is defined as the greater weight of the evidence, *i.e.*, enough to tip a scale slightly." ***Id.*** (citation, original quotation marks, and original brackets omitted).

Simply stated, the PFA Act is designed to "to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advanc[ing the] prevention of physical and sexual abuse." ***Buchhalter v. Buchhalter***, 959 A.2d 1260, 1262 (Pa. Super. 2008). In order to be granted a PFA order, the petitioner "must prove the allegation of abuse by a

---

challenge. ***See*** Appellant's *Pro Se* Affidavit for Appeal, 2/6/24, at § 5. Although we do not condone Appellant's failure to adhere to the requirements set forth in the Pennsylvania Rules of Appellate Procedure, Appellant's omissions do not impede our review and, as such, we do not find them to be substantial. Therefore, we decline to exercise our discretion to quash or dismiss this appeal. ***See*** Pa.R.A.P. 2101; ***see also Commonwealth v. Levy***, 83 A.3d 457, 461 n.2 (Pa. Super. 2013) (declining to quash or dismiss the appeal where Levy's brief failed to adhere to the requirements of the appellate rules); Pa.R.A.P. 105(a) (stating, "[t]hese rules shall be liberally applied to secure the just, speedy, and inexpensive determination of every matter to which they are applicable"). As such, Johnston's motion to quash Appellant's appeal, filed with this Court on February 26, 2024, is denied.

preponderance of the evidence." 23 Pa.C.S.A. § 6107(a); *see also E.K.*, 237 A.3d at 519 (stating, a petitioner is required to establish abuse by a preponderance of the evidence).

Section 6102(a) of the Domestic Relations Code defines "abuse" as

The occurrence of one or more of the following acts between family or household members, sexual or intimate partners[,] or persons who share biological parenthood:

(1) Attempting to cause or intentionally, knowingly[,] or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault[,] or incest with or without a deadly weapon.

(2) Placing another in reasonable fear of imminent serious bodily injury.

(3) The infliction of false imprisonment pursuant to 18 Pa.C.S.[A.] § 2903 (relating to false imprisonment).

(4) Physically or sexually abusing minor children, including such terms as defined in Chapter 63 (relating to child protective services).

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S.A. § 6102(a).

Here, Appellant contends that the trial court erred in finding that he attempted to cause or caused, *inter alia*, bodily injury or serious bodily injury. Appellant's Brief at 3-4. Appellant argues that, at the PFA hearing, Johnston

failed to present proof of injury and that "her father reported that at no point did he see a need for her to seek medical care as she had not been injured." *Id.* Appellant further contends that "[a]t no point was there an attempt [by Appellant] to intimidate or initiate fear with [Johnston]." *Id.* at 4. Appellant argues that Johnston did not file her petition seeking a PFA order out of fear of imminent serious bodily harm but, rather, as a retaliatory action for Appellant questioning Johnston about an alleged theft of an item from Appellant's residence by either Johnston or her brother. *Id.* at 4-5. Finally, Appellant asserts that the trial court erred in finding that Appellant followed Johnston and thereby knowingly engaged in a course of conduct or repeatedly committed acts towards Johnston that placed her in reasonable fear of bodily injury. *Id.* at 5-6. Appellant argues that the evidence supports a finding that Appellant met with Johnston at Johnston's request and, when Johnston attempted to leave, Appellant did not follow. *Id.*

In granting Johnston's request for a final PFA order, the trial court found that

> [Johnston] told [Appellant] that their relationship was over after they engaged in a physical fight [on October 1, 2023], instigated by [Appellant], when [Johnston] was retrieving her belongings. From October 1[, 2023,] through October 9, 2023, [Appellant] repeatedly [sent text messages] to [Johnston] and called and [sent text messages], repeatedly, to her parents. [Appellant] followed [Johnston] to work and blocked her vehicle in the roadway with his [vehicle]. He stated in a [text message to Johnston's] father that "your (*sic*) playing with fire – I promise you this won't end well so I suggest you talk her down."

Trial Court Opinion, 12/15/23, at 1-2 (emphasis omitted). The trial court further explained that

> [Appellant's] actions meet the definition of "abuse" under [Section 6102(a)], *i.e.*, [Appellant] attempted to cause bodily injury to [Johnston. Appellant] placed [Johnston] in reasonable fear of serious bodily injury. [Appellant] knowingly engaged in a course of conduct under circumstances which placed [Johnston] in reasonable fear of bodily injury. [Appellant's] actions were inexcusable and certainly frightening and harassing toward [Johnston]. These are [] precisely the type of facts and circumstances envisioned by the [PFA] Act.

*Id.* at 2.

At the PFA hearing, Johnston, at first, described her relationship with Appellant as a short-term, intimate relationship that began during the second week of September 2023. N.T., 10/24/23, at 2. Later, on cross-examination, Johnston admitted that she had previously been involved with Appellant, had resided with him for one month in April 2023, and that she had moved back into Appellant's residence in September 2023. *Id.* at 18-19. Johnston agreed that her relationship with Appellant has "kind of been on and off for [] some years." *Id.* at 18.

Johnston testified that, on October 1, 2023, while Johnston and her children were at Appellant's residence, Appellant became verbally abusive towards Johnston. *Id.* at 3. At some point, according to Johnston, Appellant pushed Johnston onto a bed, began strangling her with his right hand, and hit Johnston in the face with his left hand. *Id.* at 3-7. Johnston testified that, while Appellant was strangling her, she had trouble breathing. *Id.* at 7. After

breaking free of Appellant, Johnston stated that Appellant refused to let her, and her children, leave the residence. *Id.* at 7-8. Ultimately, Johnston and her children were rescued by Johnston's father. *Id.* at 7. Johnston admitted on cross-examination that during their altercation, she also hit Appellant and left marks on him. *Id.* at 19.

Johnston did not report the incident to the police or immediately seek a PFA order. *Id.* at 10. Johnston also did not seek medical treatment after the altercation. *Id.* at 19. Instead, she informed Appellant that the relationship ended and that the two parties should "move on in [their] own ways." *Id.* at 10.

On October 10, 2023, Johnston applied for a temporary PFA order. Johnston explained that between October 1, 2023, and October 9, 2023, Appellant continually called her and sent her text messages, as well as followed her to work. *Id.* at 11. Johnston explained that, during this time period, Appellant called her over 100 times and sent her more than 80 text messages. *Id.* at 23. Johnston stated that on October 6, 2023, Appellant showed up at her place of employment and verbally argued with her. *Id.* Johnston also explained that, during this time period, Appellant called her father and sent text messages to both her father and her mother. *Id.* at 12. Johnston testified that, because of his actions, she was "still scared of" Appellant. *Id.* at 13.

On cross-examination, Johnston acknowledged that on the evening before she filed her PFA petition (October 9, 2023), she received text

messages from Appellant regarding the disappearance of an engagement ring from Appellant's residence. *Id.* at 21. Because of Appellant's text messages, Johnston knew that Appellant might seek police intervention over the disappearance of the ring. *Id.* On re-direct examination, Johnston testified that she returned the engagement ring to Appellant before leaving his residence on October 1, 2023. *Id.* at 22.

Johnston further admitted on cross-examination that, after the altercation on October 1, 2023, she responded to some of Appellant's text messages or otherwise carried out civil text message exchanges with Appellant. *Id.* at 17. One example was a chain of text messages on October 4, 2023, in which Johnston agreed to allow Appellant to pay for her clothing order. *Id.* at 17-18.

Johnston's father testified that on the evening of October 1, 2023, he retrieved Johnston and her children from Appellant's residence and that all parties appeared upset and were crying. *Id.* at 27-29. Later that evening, Johnston's father observed red marks on Johnston's neck and arm. *Id.* at 30. Johnston's father testified that during the days following the incident, Appellant sent him "numerous text messages about wanting to talk[.]" *Id.* Johnston's father did not reply. *Id.* Finally, on October 10, 2023, Appellant spoke with Johnston's father *via* cellular telephone after receiving notice that Johnston had filed a petition seeking a PFA order against him. Appellant stated, "[y]ou better talk her down because this ain't gonna fucking end good." *Id.* Following Appellant's telephone call to Johnston's father, Appellant

sent Johnston's father a text message stating, "Grow the fuck up, PFA [against] a guy who had bent over backwards . . . she beat the fuck out of, lied [to,] and stole the ring [from]. You're playing with fire. I promise this won't end well so I suggest you talk her down." *Id.* at 32.

Appellant described his relationship with Johnston as "an off and on relationship for almost two years." *Id.* at 36. He stated that he and Johnston resided together at his residence from mid-April 2023 to mid-May 2023, and again from mid-September 2023 to October 1, 2023. *Id.* Appellant explained that, during his separation from Johnston, Johnston became involved with another individual and that Johnston's communication with the third party on October 1, 2023, was, *inter alia*, the catalyst for the altercation. *Id.* 37-40. Appellant described the altercation on October 1, 2023, as one in which Johnston began hitting him and, eventually, he "was on top of her" "trying to get her to calm down[.]" *Id.* at 40. Appellant admitted that he does not recall if he pushed Johnston onto the futon or how she ended up on the futon. *Id.* Appellant also admitted that he put his hands around Johnston's throat after she put her hands around Appellant's throat "with significant force." *Id.* at 40-42. Appellant stated that Johnston pushed him and caused him to fall down the stairs. *Id.* As a result of Johnston's actions, Appellant stated he suffered a "black eye on the left eye" and had red marks and choke marks on

his neck and bruises on his arm.[5] *Id.* at 43. Appellant testified that several hours after the incident, he and Johnston engaged in a telephone conversation in which both parties talked about "trying to work through the situation" and that their goal was to "continue to develop a relationship[.]" *Id.* at 46. Appellant also stated that Johnston sent him a text message that same night (October 1, 2023) in which she apologized for her conduct. *Id.* at 47. Appellant further explained that he and Johnston agreed to keep the police from becoming involved in the situation because Johnston believed "using law enforcement would hurt her career and ultimately impact her children." *Id.* at 58.

Appellant testified that, in early October 2023, he and Johnston continued to communicate with each other and met on several occasions. *Id.* at 48-49. Appellant explained that one afternoon he and Johnston "met at lunchtime and walked along the river [talking] about [their] relationship[.]" *Id.* at 48. Appellant also reiterated his conversation with Johnston regarding the clothing order, as discussed *supra*, and another situation where Johnston contacted Appellant and "request[ed] money for crafts" for the children while at camp. *Id.* at 49. Appellant stated that he never followed Johnston to work "unless it was a pre-planned arrangement." *Id.* at 52.

---

[5] Appellant introduced several exhibits at the PFA hearing that included photographs depicting the injuries he suffered as part of the October 1, 2023 incident. *See* N.T., 10/24/23, at 44-45. Appellant's exhibits, however, are not part of the certified record currently before us.

Appellant explained that on October 9, 2023, Johnston "came [into his residence] on her own, walked through the house as if she owned the house, went [] upstairs, got what few remaining items were still in the house, [and informed Appellant] she didn't want to have any further conversation or talk about [their] relationship [but told Appellant he could] come out and see the kids if [he] wanted to." *Id.* at 50. Appellant stated that Johnston did not "seem fearful or concerned at all" when she was at his residence. *Id.* at 50. The next day, Appellant received notice that Johnston had filed a petition seeking a PFA order against him. *Id.* at 52.

In viewing the evidence in the light most favorable to Johnston, as the petitioner, sufficient evidence was presented to prove by a preponderance of the evidence that Appellant abused Johnston, as defined by the PFA Act. As discussed *supra*, abuse occurs when, *inter alia*, a party's actions cause bodily injury. 23 Pa.C.S.A. § 6102(a). The PFA Act does not define the term "bodily injury" but, rather, adopts the definition as set forth in the Pennsylvania Crimes Code. 23 Pa.C.S.A. § 6102(b). Section 2301 of the Crimes Code defines "bodily injury" as "impairment of physical condition or substantial pain." 18 Pa.C.S.A. § 2301. "The existence of substantial pain may be inferred from the circumstances surrounding the use of physical force even in the absence of a significant injury." ***Commonwealth v. Ogin***, 540 A.2d 549, 552 (Pa. Super. 1988) (*en banc*), *appeal denied*, 557 A.2d 343 (Pa. 1989).

On October 1, 2023, a heated argument occurred between the parties and at some point during that argument, Appellant, a 275-pound male,[6] was on top of Johnston pinning her to the futon. Appellant admits that he put his hands around Johnston's neck. Johnston stated that, as a result of Appellant's actions, she had trouble breathing and observed red marks on her neck. Johnston's father confirmed that, later that same evening, he observed red marks on Johnston's neck area. Based upon the evidence, when viewed in the light most favorable to Johnston, we concur with the trial court that Appellant's actions towards Johnston on the evening of October 1, 2023, arose to the level of abuse for purpose of the PFA Act. Appellant placed his hand on Johnston's neck such that she experienced trouble breathing and the amount of force used by Appellant was sufficient to leave red marks on Johnston's neck area that were visible several hours later.[7]

Order affirmed. Appellee's Motion to Quash Appeal denied.

---

[6] Johnston described Appellant as a 5 foot, 4 inch tall male that weighed "280-ish" and described herself as a 5 foot, 3 inch tall female that weighed "approximately 180 pounds." N.T., 10/24/23, at 4-5.

[7] To the extent that Appellant challenges the weight of the evidence to support the issuance of the final PFA order, Appellant's assertions invite this Court to do nothing more than reassess the witness credibility and reweigh the evidence in an attempt to convince us to reach a result different than the one reached by the trial court as fact-finder. We decline Appellant's invitation since the fact-finder, while passing on the credibility of the witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence. *Commonwealth v. Dunkins*, 229 A.3d 622, 634 (Pa. Super. 2020), *aff'd*, 263 A.3d 247 (Pa. 2021), *cert. denied*, 142 S.Ct. 1679 (2022).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/20/2024