J-A07002-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| REBECCA ANNE SHEPSKI | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL JAMES SHEPSKI | : | |
| | : | |
| Appellant | : | No. 1609 MDA 2024 |

Appeal from the Order Entered October 11, 2024
In the Court of Common Pleas of Centre County Civil Division at No(s):
2024-CV-2538-PR

BEFORE:  BOWES, J., OLSON, J., and STABILE, J.

MEMORANDUM BY BOWES, J.:                    **FILED: APRIL 29, 2025**

Michael James Shepski ("Husband") appeals from the final order entered pursuant to the Protection from Abuse ("PFA") Act, granting the petition filed by Rebecca Anne Shepski ("Wife").  We affirm.

We glean the following history from the certified record.  Husband and Wife met in Australia, were married for over sixteen years, and are the parents to three minor children.  The parties subsequently separated and Wife initiated divorce proceedings in May 2023, which Husband contested.  Initially, the parties verbally agreed to transfer physical custody of the children every two days.  Not long before the instant PFA proceedings, they modified the arrangement to alternate custody on a two-two-three schedule.  Due in part to disagreements around the custody exchanges and the viability of the schedule for Husband, the parties turned to the courts and underwent co-parenting counseling in an effort to resolve the issues by stipulation.  Having

no resolution by September 2024, Wife filed a *praecipe* to schedule a custody trial.

The next day, Wife filed the underlying PFA petition, naming only herself as the person to be protected. The PFA court, which was presided over by the same judge assigned to the parties' custody docket, immediately granted a temporary PFA order. No formal custody order was in place at that time for the children, who were at that point eleven, thirteen, and sixteen years old. The temporary PFA order included a custody provision that maintained the then-existing two-two-three schedule but modified the exchanges to occur by the children riding the school bus to and from the custodial parent's home. Given the complexity of the two-two-three alternating schedule, the court included a detailed custody provision to ensure it was "clear enough that it's enforceable." N.T. Temporary PFA Hearing, 9/26/24, at 6.

The parties both appeared for the final PFA hearing and presented evidence. Wife testified and additionally called her partner, Jasmiene Rumford-Carranza, as a witness. Ms. Rumford-Carranza relayed an incident, which occurred at church sometime shortly before the filing of the PFA petition, where Husband "stormed towards" Wife, "belittling her" and "got in her face" such that they "probably could have been touching." N.T. Final PFA Hearing, 10/8/24, at 9-10. This confrontation prompted Ms. Rumford-Carranza to step in between Husband and Wife to de-escalate the situation and direct them outside. She conveyed two additional instances of Husband being in Wife's face, towering over her, and loudly "demand[ing] respect" prior to the filing

- 2 -

of the PFA petition, one of which occurred during a custody exchange at Wife's residence. *Id*. at 11-12. Ms. Rumford-Carranza further explained that Husband sends Wife emails "every single day, morning, night[,]" that cause Wife to cry. *Id*. at 13.

Wife confirmed her fear of Husband and expounded upon the three incidents referenced by Ms. Rumford-Carranza. In addition, she stated that on another occasion when she attempted to pick up their son after he went to Husband's house from the school bus during Wife's custodial time, Husband refused to have their son come outside and instead leaned against Wife's car and yelled at her. Afraid and unsure what to do, she put up her window and called the police. *Id*. at 37-38.

She also proffered seven exhibits demonstrating the nature of the communication between her and Husband. In one written exchange, Husband insinuated that Wife had mental distortions that he claimed were the result of different undiagnosed ailments. She iterated that Husband had, throughout their marriage, accused her of having mental disorders that caused her to have inaccurate memories. *Id*. at 27-28. In other messages, Husband conveyed his belief that God condemned their divorce, she remained his wife regardless of what she said to the contrary, and that it was God's plan for them to stay together. *Id*. at 29-32. Wife elaborated that Husband had used exposure therapy and religion to pressure her to do things sexually that she did not want to do during their marriage. *Id*. at 57. She noted that each

interaction with him caused her to "remember the . . . stuff that he's done." *Id*. at 39.

Wife described the change since the temporary PFA order went into effect as "Heaven" and a "break from constantly being . . . attacked and having accusations throw[n] at [her] and not having to like work [her] way around all of this psychological stuff that he does[.]" *Id*. at 38-39. As Wife recounted it, she filed the PFA petition because she was "so exhausted by it and [was] sick of being scared." *Id*. at 38.

Husband testified in his defense. According to him, the church interaction did not involve any confrontation. *Id*. at 69. Rather, he contended that Wife filed the PFA petition to bypass the custody process and obtain terms more favorable to her, such as the bus exchange and maintenance of the two-two-three schedule. Husband also solicited testimony from his sister, Lori Tahn. She explained that Wife often turned to her when upset and based upon these interactions believed that Wife had developed a pattern of being "the victim and everyone else is to blame." *Id*. at 81.

At the conclusion of the hearing, the court found that Wife had met her burden and entered a final, three-year PFA order. Notably, it directed that custody would be superseded and governed by any orders entered on the separate custody docket. However, by the time of the final hearing, no order had yet been issued. Therefore, in the meantime, the court continued the provisions set forth in the temporary PFA order, including the requirement that custody exchanges occur by the children riding the school bus from the

custodial parent's residence. It also limited Husband's communications with Wife to be only through the Our Family Wizard co-parenting application, concerning the children, and between 8:00 a.m. and 9:00 p.m.

Husband filed a timely notice of appeal. Both he and the trial court complied with Pa.R.A.P. 1925. Husband presents the following issues for our consideration:

1. Did the trial court err in entering a final [PFA] order of court against Husband in considering that Wife failed to prove that Husband abused her as defined under 23 Pa.C.S. § 6102(a)(1)-(5)?

2. Did the trial court err in entering a final [PFA] order of court against Husband for the full statutory period of three years in absence of any evidence of abuse as defined under 23 Pa.C.S. § 6102(a)(1)-(5)?

3. Did the trial court commit an abuse of discretion in failing to consider that the temporary and final [PFA] orders were in fact an abuse of the custody litigation process by Wife?

4. Did the trial court commit an abuse of discretion in failing to consider the best interests of the minor children as required by 23 Pa.C.S. § 5328 through entering a custody provision in the final [PFA] order of court?

Husband's brief at 4-5 (some capitalization altered).

We review a court's legal conclusions in PFA orders for an error of law or abuse of discretion. *See E.K. v. J.R.A.*, 237 A.3d 509, 519 (Pa.Super. 2020). Husband first assails the court's finding that Wife established abuse. We consider this claim pursuant to the following principles:

The PFA Act does not seek to determine criminal culpability. A petitioner is not required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of

the evidence. A preponderance of the evidence standard is defined as the greater weight of the evidence, *i.e.*, enough to tip a scale slightly.

When a claim is presented on appeal that the evidence was not sufficient to support an order of protection from abuse, we review the evidence in the light most favorable to the petitioner and granting her the benefit of all reasonable inferences, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it.

. . . .

The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse. In the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of imminent serious bodily injury. Past acts are significant in determining the reasonableness of a PFA petitioner's fear.

*Id*. at 519 (cleaned up).

The pertinent definition of abuse within the PFA Act provides as follows:

**"Abuse."** The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

. . . .

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S. § 6102(a). Finally:

- 6 -

> In the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of bodily injury. The intent of the alleged abuser is of no moment. Moreover, this Court has held that past acts are significant in determining the reasonableness of a PFA petitioner's fear. As the goal of the Act is to prevent physical and sexual abuse, a victim does not have to wait for physical or sexual abuse to occur for the Act to apply.

*K.B. v. Tinsley*, 208 A.3d 123, 128 (Pa.Super. 2019) (cleaned up).

Husband's first two issues hinge upon his allegation that the PFA court erred in determining that Wife had sustained her burden of proving abuse. He maintains that the exhibits introduced at trial did not establish abuse pursuant to § 6102(a)(5). In his view:

> [He] never engaged in a course of conduct that placed Wife in reasonable fear of bodily injury, nor did his conduct come close to rising to the level of how the appellants in *Mescanti v. Mescanti*, 956 A.2d 1017 (Pa.Super. 2008), and *T.K. v. A.Z.*, 157 A.3d 974 (Pa.Super. 2017), behaved.

Husband's brief at 24 (citations altered).

In *Mescanti*, we affirmed the trial court's finding of § 6102(a)(5) abuse where the husband, over the course of multiple months, provoked arguments with his wife, rummaged through her personal belongings, followed her in public, deprived her of sleep, alternately locked her out of and inside the marital home, professed his obsession with her, and, on the final date in issue, audibly cocked his firearm after warning her not to go to sleep. In *T.K.*, we agreed with the trial court that the petitioner had established abuse under the same subsection based upon the defendant following her in public on foot and by vehicle, tracking her whereabouts, driving past her home and honking the

horn, and attempting to yell to her while talking to their children despite a court order limiting communication to a specific application.

Contrarily, Husband contends that Wife's annoyance at his reconciliation attempts did not amount to abuse pursuant to § 6102(a)(5). *See* Husband's brief at 26. He insists that the messages admitted at the final PFA hearing did not support a finding that he tried to convince Wife that she suffered from various ailments, and that he "never attempted to manipulate Wife using religion, but rather he was trying to use religion to guide the parties' relationship in hopes of reconciling the same." *Id*. at 25-26 (citation omitted).

The PFA court disagreed with Husband's characterization of his communications with Wife. It credited Wife's testimony of Husband's sexual abuse during the marriage, gaslighting, and refusal to accept Wife's desire to divorce. Moreover, it noted that Husband had "repeatedly ignored [Wife's] request" to contact her only about matters concerning their children. *See* PFA Court Opinion, 11/27/24, at 2. The court found that the admitted messages from January 2024 through September 2024 corroborated her testimony. *Id*.

Further, it explicitly discredited Husband's version of the church incident, instead giving weight to the description provided by Wife and her partner:

> Both [Wife] and Ms. Rumford-Carranza testified that, during the encounter about the child [at church], [Husband] was towering over [Wife], pointing his finger in her face, and demanding that she respect him. [Wife] was shaken and crying. Ms. Rumford-Carranza felt she had to step between [Husband] and [Wife] because of his demeanor toward her. [Wife] testified that it

concerned her that [Husband] was behaving this way in a public place, and that she felt his aggressive behavior toward her was escalating. She testified that she was afraid of [Husband] during the encounter given his size and behavior.

*Id*. at 3. Finally, the court found sufficient evidence to establish the other two incidents, initiated by Husband, where he "physically tower[ed] over [Wife] and demand[ed] that she respect him," placing her in fear "for her physical safety." *Id*. In both instances, he refused to leave when she asked.

The PFA court summarized its findings thusly:

The court found the testimony of [Wife] and her witness to be credible, and found that [Husband]'s behavior toward [Wife] demonstrated that he has engaged in a course of conduct and repeatedly committed acts toward [Wife] under circumstances placing [her] in reasonable fear of bodily injury. Moreover, the evidence demonstrated that [Husband] knowingly engaged in the conduct, and did so despite [Wife]'s repeatedly telling him she was afraid of him. The court found credible [Wife]'s fear that [Husband] would inflict bodily injury upon her to be reasonable. In so concluding, the court considered the backdrop of the parties' separation and [Husband]'s refusal to accept her decision to divorce, the history of conduct during the marriage as testified to by [Wife], his manipulative communications to her, and the incidents during which he physically towered over her and behaved in a menacing manner.

*Id*.

While we agree with Husband that his conduct was not identical to that committed in *Mescanti* and *T.K.*, our review of the certified record nonetheless confirms the PFA court's conclusion that Wife established abuse pursuant to § 6102(a)(5) by virtue of Husband's escalating in-person encounters and electronic communications. *See R.G. v. T.D.*, 672 A.2d 341, 342 (Pa.Super. 1996) (finding evidence sufficient to prove § 6102(a)(5) abuse

- 9 -

where defendant repeatedly called and sent increasingly hostile electronic messages despite being asked to stop, told petitioner that she was the object of his obsessive-compulsive disorder, and causing petitioner to be afraid to walk around campus). Accordingly, we discern no error of law or abuse of discretion in this regard.

Based upon his claim that Wife did not prove abuse, Husband next argues that the court erred in granting the final PFA order for the full statutory period of three years. *See* Husband's brief at 27. He claims that such lengthy "PFA orders are reserved for extreme cases, such as" in *Mescanti* or *T.K. Id*. at 29 (some capitalization altered). In further support, he cited Ms. Than's "testimony that Wife has the propensity to feel victimized in situations where she is not in fact a victim[.]" *Id*. At bottom, Husband insists that the court erred in entering a three-year period for the final PFA order because Wife did not establish abuse and his conduct did not rise to the level of the defendants in *Mescanti* and *T.K. Id*. at 30.

As discussed hereinabove, while Husband's conduct did not mirror those defendants, Wife nonetheless proved abuse pursuant to § 6102(a)(5). Moreover, insofar as Husband contests how the PFA court weighed the testimony admitted at the final PFA hearing, "[t]his Court defers to the credibility determinations of the trial court as to witnesses who appeared before it." *E.K.*, 237 A.3d at 519. As noted, the court credited the testimony offered by Wife over that of Husband. We will not disturb that determination. Bearing this in mind, we observe that once the PFA court found abuse, it was

- 10 -

required to set the PFA order "for a fixed period of time not to exceed three years." 23 Pa.C.S. § 6108(d). Husband offers no argument to shorten the three-year-period beyond his contention, which we already rejected, that Wife did not prove abuse. Since the PFA court was authorized to set the PFA order for the period it did, we perceive no reason to disturb that decision. Accordingly, this claim fails.

In Husband's final two issues, he assails the custody portion of the PFA order. Namely, he asserts that the PFA court (1) failed to acknowledge that Wife's PFA petition improperly allowed her to bypass traditional custody procedures; and (2) abused its discretion in entering a custody provision in the final PFA order without first considering the best interests of the children pursuant to the sixteen factors set forth at 23 Pa.C.S. § 5328. *See* Husband's brief at 30, 34. He alleges that Wife "used the PFA process as a sword against [him] to gain leverage in custody litigation." *Id*. at 31. According to Husband, the PFA order provided Wife the exact custody-exchange arrangement that she had not yet been able to secure in the custody litigation. *Id*. at 33.

The PFA court explained that it considered Father's argument about Wife's purported misuse of the PFA Act to game the custody proceedings but ultimately found it spurious. *See* PFA Court Opinion, 11/27/24, at 4. As to his second claim of error, the court discussed the temporary nature of the custody provisions within the final PFA order, the time and logistical restraints surrounding PFA proceedings generally, and the anticipation of a future custody trial. *Id*. While acknowledging that it did not consider the sixteen

best-interest factors relevant to custody matters, the court claimed that it weighed "the children's best interests in the context of the information developed on the PFA record." *Id*. Specifically, since it found that Husband had acted aggressively during a custody exchange, it determined that eliminating contact between Husband and Wife during the exchanges by having the children instead switch bus stops based upon the custodial parent served the best interests of the children. *Id*.

To address Husband's final two issues, "we must examine the connection between the [PFA] Act (23 Pa.C.S. §§ 6101-6122) and the current iteration of the Child Custody Act (23 Pa.C.S. §§ 5321 – 5340), both of which are chapters under the Domestic Relations Code. When considering issues of statutory interpretation, the applicable standard of review is *de novo* and our scope of review is plenary." *C.H.L. v. W.D.L.*, 214 A.3d 1272, 1280 (Pa.Super. 2019) (citations altered or omitted).

In *C.H.L.*, this Court held "that a PFA court need not conduct a best interests custody analysis to award **temporary** custody as [a] form of relief under [§] 6108 of the [PFA] Act." *Id*. at 1281 (emphasis in original). In so holding, we observed:

> [A] temporary custody provision in a PFA order is just like any other interim custody order. Section 5323(b) of the Child Custody Act makes clear that interim custody orders are not the types of custody awards necessitating a [sixteen]-factor, best interests analysis under [§] 5328(a). Often, it will be reasonable and necessary for the trial court to institute a temporary arrangement as a stopgap during litigation. It is well-settled that [a] trial court has authority to award custody on a temporary basis so that it

may address emergency situations and protect a child until a final custody hearing can be held, when a permanent order can be entered.

*Id*. at 1283 (cleaned up). Put simply, we concluded that "[t]he best interests mandate only applies to final custody awards, not temporary solutions to emergencies." *Id*. This holding was fully cognizant of the concern expressed by Husband's accusations against Wife's motives in filing the instant PFA petition. To wit, we opined:

> We recognize the apprehension that some could exploit the PFA Act, *i.e.* that dishonest parents might utilize a protection order as a vehicle to bypass the Child Custody Act and obtain a backdoor custody modification. The Domestic Relations Code accounts for the potential exploitation by separating the custody issue into two inquiries: first, a PFA court addresses the exigent risk of abuse posed to the child as well as the petitioner; thereafter, the custody court determines the child's best interests. This procedure safeguards the rights [of] both parties in their dual roles as PFA litigants and as parents.[7]
>
> _____
>
> [7] In larger counties where the courts have been able to adopt a "one family, one judge" policy, this process is all the more seamless.

*Id*. at 1284.

In light of this binding precedent, we have no cause to disturb the custody portion of the PFA order. Plainly, the PFA court was permitted to temporarily modify custody, without regard for the § 5328 factors, to address the emergency presented by the PFA petition until a formal custody order could be entered on the custody docket. *Id*. Furthermore, we note that the same judge was assigned to the PFA proceedings and the ongoing custody

litigation, thereby mitigating against the possibility of either party exploiting the PFA Act in adjudicating custody of their children.

Based on the foregoing, we affirm the final PFA order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/29/2025